Hillsborough,
No. 4636.

AMOSKEAG-LAWRENCE MILLS, INC. *v.* STATE.

Argued April 16 ,1958.

Decided July 18, 1958.

McLane, Carleton, Graf, Greene & Brown and G. Marshall Abbey (Mr. Brown orally), for the plaintiff.

Louis C. Wyman, Attorney General, and Dort S. Bigg, Law Assistant (Mr. Wyman orally), for the State.

WHEELER, J.  The State, on September 8, 1955, took by eminent domain a tract of land of the plaintiff on the west side of the Merrimack river in Manchester containing 142,000 square feet on which was located a building known as the "river warehouse," a brick building 1073 feet long and 68 feet wide, 4 stories high and containing 290,000 square feet of floor space.  The premises were utilized at the time of the taking for industrial purposes as an integral part of the plaintiff's textile manufacturing operations.

The warehouse was purchased on March 1, 1946, for $38,868 as a storehouse for raw wool as part of a proposed plan for the establishment of a "top" mill which consists of a  scouring and combing plant.  The capacity of the top mill governs the size and operation of the spinning and weaving sections and in turn requires adequate storage facilities for raw wool of various grades, of sufficient size to insure a supply at all times.

Prior to the purchase of the river warehouse on November 1, 1941, the plaintiff acquired what is known as the Amory mill on the east side of the river, for $160,000, allocating $50,000 of the purchase price to real estate.  In 1942, an office building was acquired for $5,000.  The northern half of what is known as No.11 mill west of the river was later acquired in 1944 for $47,500.  The northern two sections of a cloth warehouse extending along the east side of No. 11 mill between it and the river warehouse were purchased in 1947 for $18,000.

Thus the group of buildings involved in the plaintiff's integrated operations was purchased between 1941 and 1947 for $159,368. Before the taking of the river warehouse, plaintiff had invested nearly ten million dollars in the acquisition and development of its properties, $7,282,000 of which represented investments in ma-

chinery. The properties, so developed, integrated a top mill with facilities for spinning, weaving and finishing textiles.

The plaintiff contends that the taking of the river warehouse made it impossible to continue the operation of the top mill, and since no warehouse of suitable size was available, the value of the top mill installation which would be recognized by a potential purchaser was reduced to liquidation value and the plaintiff is therefore entitled to severance damages with respect to the top mill as well as with respect to the No. 11 mill property adjoining the warehouse.

The plaintiff assigns eight specific exceptions as grounds for a new trial as well as the principal issue advanced in its brief and oral argument which " . . . broadly speaking and without reference to the specific exceptions which raise it, is whether valuation of property already developed to its admittedly highest and best use, and in use, is to be computed recognizing the added value that the *existing* adaptation creates, or whether the property is to be valued without reference to such existing increment of value, as if it were not already adapted." It is urged that the Trial Court adopted the latter view, which was the view of the State, and improperly ignored the plaintiff's theory of valuation.

The plaintiff's theory of valuation as we understand it is that the plaintiff's integrated plant was a unique industrial property in operation and that injustice results in applying rules of valuation developed at a time when most properties condemned were undeveloped. The record does not reveal that plaintiff was unduly restricted in advancing its theory of valuation. During the course of the trial the Court permitted the plaintiff to introduce evidence of reproduction and replacement costs, integrated operations of the top mill with other departments, the properties with machinery in place, severance damage and in general practically everything advanced by the plaintiff with the exception of the cost of removal of the machinery, all over the vigorous objections of State's counsel. Plaintiff's witnesses testified that the loss occasioned by the taking, using both the summation and capitalization methods, would amount to between $900,000 to over $1,000,000. The State's witnesses, using the comparative sales approach and capitalization methods, testified the loss was between $110,000 and $125,000. In *Edgcomb Steel Co.* v. *State*, 100 N. H. 480, a comprehensive rule of what constituted fair market value was established, in harmony with the great weight of authority. *Olson* v. *United*

*States,* 292 U. S. 246. Among other tests in determining value the plaintiff is entitled to have his property appraised for the most advantageous and profitable use to which it could be put. *Low* v. *Railroad,* 63 N. H. 557; *Emmons* v. *Company,* 83 N. H. 181.

The plaintiff claims that the rulings of the Trial Court, both during its opening statement and during the presentation of evidence relating to severance damages, were erroneous. In the plaintiff's opening statement, plaintiff's counsel stated its position to be that the taking of the warehouse made the top mill completely inoperative and because it was without warehouse capacity it could not operate the top making plant and the severance necessarily resulted in a depreciated value of the Amory Mill. As a result of an objection by State's counsel, a colloquy ensued between plaintiff's counsel and the Court, during which the Court stated, in substance, that there could be no recovery for being put out of business but that the measure of damages was the difference between the value before and after taking and its effect on the remaining property or the value of the business. Plaintiff's counsel agreed with the Court that it could not recover for loss of profits "or anything of that kind." While the plaintiff excepted to certain tentative rulings of the Court during plaintiff's opening statement, it does not appear from the record as a whole that any prejudicial error resulted from these rulings.

The plaintiff introduced evidence through expert witnesses that the difference between the value of the integrated properties before the taking of the warehouse and after the taking ranged between $927,000 and $1,061,000. The witness who testified to the latter figure further testified that in his opinion the severance damage caused to the plaintiff by removal of the river warehouse was in excess of $300,000.

The plaintiff offered to show, through witness McKettrick, that the taking of the river warehouse on September 8, 1955, reduced the value of the top mill installation which would be recognized by a potential purchaser of such an installation by at least the difference between four hundred and seventy-five thousand and three hundred and ten thousand or one hundred and sixty-five thousand. The offer was rejected by the Court. Plaintiff argues that the offer was clearly admissible under the *Edgcomb* case, *supra,* as well as being competent evidence of damages occasioned by the taking for which it is entitled to be compensated. After some colloquy with the Court, counsel agreed that the offer of proof included the value

of the machinery and argued; "It's the loss of value represented by the combination of the machinery in place . . . which is a recognized value which a potential purchaser would recognize and does recognize."

Analysis of the offer of proof shows that the figure of $165,000 offered as the difference between the before and after value of the top mill, actually represented the total of the cost of transporting and installing the machinery in the mill, the cost of equipping the mill to handle materials and the cost of humidifier systems; the valuation placed on the machinery was merely added to this figure to establish the value of the top mill before the taking,, and subtracted again to arrive at the amount "that the taking of the River Warehouse . . . reduced the value of the top mill installation." How the costs just enumerated can be recoverable as an element of damage caused by severance is not apparent. They reflect the cost of converting an empty building into an operating top mill with machinery installed. But severance of the river warehouse did not empty the top mill of machinery or equipment, and no subsequent purchaser of the remainder of the integrated operation would be expected to discount its value on a basis of the cost of installing in the mill what was already there. This offer of proof through witness McKettrick was properly excluded.

If the plaintiff's theory was that the machinery would be removed because the mill could not be operated without the warehouse, then its loss would be measured by the decrease in the value of the mill for less advantageous uses, and not by the cost of establishing the use which could no longer be made. The plaintiff's witness Beal in arriving at his opinion as to the full severance damage based his figures upon the decreased rental value of the remaining property after the taking.

It is urged that the State's evidence was improperly considered under the law of the trial as charged to the jury and that the Court unreasonably interfered with the plaintiff's effort to cross-examine the witness Jenkins. The first of these contentions is based upon the circumstances that neither of the State's expert witnesses took into account the property of the plaintiff situated on the east side of the river in their testimony concerning values. From this it is argued that since the jury was told to determine the difference between the fair market value of the plaintiff's entire holdings before the taking and the fair market value of the remainder after the taking, the State's evidence was not entitled to consideration.

The State, however, was not required to recognize by its evidence the existence of severance damages with respect to the Amory mill and the top mill. Its evidence relating to the plaintiff's properties on the west side of the river alone was properly before the jury for consideration so far as those properties were concerned. Evidence introduced by the plaintiff of severance damages with respect to property east of the river could be accepted or rejected as the jury saw fit. The State's evidence did not become incompetent because it did not relate to all of the damages which the plaintiff claimed to have suffered.

The witness Jenkins testified that in his opinion the value of the river warehouse and land taken was $75,000, of which $28,500 was allotted to land and $46,500 to the building. Plaintiff's counsel attempted to demonstrate by means of a chalk the inconsistency of this testimony with figures contained in the witness' written appraisal showing "improvements" totalling $95,800. In the course of this cross-examination the Court intervened with comments on the impropriety of adding certain items already in place at the time of acquisition to items of improvements made by the plaintiff. Since questions by the Court are likely to have special significance to the jury, a minimum of such questions is ordinarily desirable. However, in this case the Court permitted plaintiff's counsel a wide latitude in cross-examination of Jenkins to test his methods of arriving at a fair market value as compared with methods used by the plaintiff's experts. We cannot say in the circumstances of this case that the trial was rendered unfair by the Court's observations and remarks or by limitation of the cross-examination.

The chief grievance of the plaintiff with respect to the Jenkins testimony seems to be that the instructions over-emphasized fair market value with the implication that comparative sales furnished the only test, contrary to plaintiff's theory that when property is unique and seldom exchanged, it has no market price and other means must be resorted to in ascertaining value. In the charge the Court told the jury in substance that they could consider in arriving at their verdict the various methods used by witnesses in arriving at values, but that the test was market value "and not any one of these other methods." This was sufficiently favorable to the plaintiff. The law was correctly stated and the charge did not favor the comparative sales method employed by Jenkins at the expense of other methods used by the plaintiff's witnesses.

It is urged that modern textbook writers supported by some authorities state that in cases where property is unique and seldom bought and sold and market value is impossible of ascertainment by the usual orthodox test, market value is not the measure of compensation. Regardless of whether the property is unique in character and market value difficult of ascertainment, it is generally based upon a hypothetical situation and it is never required that there should in fact have been a person able and willing to buy. 4 Nichols, Eminent Domain, *s.* 12:32, *p.* 134. While it is well settled that it is the owner's loss and not the gain to the condemnor which is the measure of damages, not all of the losses suffered by the owner are compensable. He is allowed the fair market value but the Constitution does not guarantee him a return on his investment. *United States* v. *Powelson,* 319 U. S. 266, 285. Neither is the owner entitled to compensation for the destruction of his business even though it could not be established elsewhere. *United States* v. *Powelson, supra,* at 283. Regardless of the type of property taken fair market value is still the standard to be applied which means the value of the property at the time of the taking, considering among other things the highest and most profitable use for which it was adapted and needed, or likely to be needed in the near future. *Olson* v. *United States,* 292 U. S. 246.

The plaintiff calls our attention to the discussion of this problem in 37 B. U. L. Rev. 495 (note), in which the author concludes "Value for every reasonable present and potential use should be carefully considered, including use of the property for the special purpose for which it has been constructed and is being employed at the time of taking." *Id.,* 503. This suggested test is not in disharmony with our decisions (*Trustees &c. Academy* v. *Exeter,* 92 N. H. 473; *Edgcomb Steel Co.* v. *State, supra*) establishing the various elements which may be considered in ascertaining market value.

The plaintiff excepted to the failure of the Court to grant certain requests and to the failure to grant certain other requests "in whole." A majority of the requests dealt with plaintiff's unique integrated operation, its adaptability for the particular business and the impact of the taking of the warehouse upon the value of the remainder of plaintiff's buildings by depriving it of the ability to use the remaining land and structures to their best advantage. Other requests dealt with the tests to be applied in ascertaining fair market value where the property is unique and evidence of comparable sales is not available.

The Court instructed the jury in substance that plaintiff's property was an integrated operation "all tied together in one unit" of which only a part was taken and the jury were to consider not only what might be the fair value of the property taken but its effect on the entire property of the plaintiff. The jury were told in arriving at their verdict they could consider the location of the property, its relation to other property, its adaptability and "all other surrounding circumstances." They were further instructed the plaintiff was entitled to have its property "valued for the most profitable and advantageous use for which it was adaptable or to which it could be put at the time of taking." They were instructed that consideration should be given to "what extent, if any, real estate being offered to the market might be of . . . more value to a potential purchaser if the building were in use and was occupied . . . whether or not an occupied building has any more value than an unoccupied building." They were also instructed: "Consider what a potential buyer might consider as a fair market value for that property as being used, that is, being used to its most advantageous use." With reference to the mill installations the Court charged the jury that they had "a right to consider all of the matters which have been presented to you, including the occupancies of the building and so forth, what installations were in it insofar as it has any effect on the building, the manner in which it had been used, improvements."

We are of the opinion viewing the charge as a whole that it adequately instructed the jury concerning market value and that the failure to grant plaintiff's requests in the language submitted was not erroneous. *Lamontagne* v. *Railroad*, 97 N. H. 6, 12.

The Court declined to give plaintiff's requests Nos. 5 and 10. No. 5 dealt with the limited access aspect of the highway. The Court charged the jury "There is no controversy over the right of the State to take the property it took to further the construction of the highway in question. That is a right, as has been explained by both counsel to you, a constitutional right and the machinery for the taking being set up by statute." During the course of the trial the jury were apprised of the type of highway under construction and its purpose. We see no error in denying the request. Request No. 10 dealt with the proposition that if the entire property affected had been sold or leased on the day of taking under favorable circumstances evidence of the price would be the best evidence in ascertaining market value, but in the absence of

evidence of such sale resort must be had to less satisfactory evidence. The Court charged the jury in substance that in the absence of comparable sales the elements which established market value "may be a little bit different than if you had a building exactly the same, right in the same area, being sold about the same time." The jury were told the various factors they should consider in the absence of such evidence in determining fair market value. Without enumerating these factors stated by the Court they substantially covered all essential elements.

In its brief and in oral argument plaintiff's counsel charges that the argument of the Attorney General was prejudicial and rendered the trial unfair. The chief complaint of plaintiff's counsel seems to be that State's counsel over-emphasized in argument the names of certain witnesses for the plaintiff in an attempt to appeal to racial prejudice and that the jury were told to use their common sense. No objection or exception was made to this line of argument except on two occasions and in each instance the plaintiff was sustained by the Court. No objection having been made during the trial the contention is not considered on appeal. *State* v. *Ketchen,* 80 N. H. 112; *Robertson* v. *Monroe,* 80 N. H. 258, 269.

Plaintiff's counsel objected and excepted to the following portions of the Attorney General's argument; "Would you have paid $75,000 for this thing on September 8, 1955? If you put $75,000 in the savings bank at 3% you get $2,500 . . . would you put your money in for 40 years . . . . ?" and "A hundred thousand dollars is an awful lot of money. If you go to work and earn money it takes a long time today before you can have $100,000.00 put away . . . If you had $100,000.00 . . . if any of us had $100,000.00 . . . but if you had $100,000.00 I think you'd hesitate before you put $100,000.00 into this 1888 building."

State's witness Jenkins testified that the river warehouse, including the land but without considering severance damages had a value on the day of taking of $75,000. Plaintiff's witnesses testified that the life expectancy was between 33 and 50 years. Plaintiff claims the argument was prejudicial, among other reasons because it "ask[ed] the jurors to visualize themselves as the actors." Nothing in the record before us indicates that State's counsel asked them to disregard the evidence and reach a verdict based solely on their experience and common sense. On the other hand, plaintiff's counsel argued to the jury that in weighing the testimony of witness Murphy: "You've got common sense and knowledge and

judgment. You know whether or not that [the river warehouse] will be lime, mortar and ashes and wood in twenty years." It was not improper argument for the Attorney General to urge the jury to adopt his theory of valuation based on the evidence.

The plaintiff urges that the testimony of State's witness Murphy should have been stricken because it was based on factors "which were totally unsubstantiated by the evidence." During cross-examination of plaintiff's witness Alphen he was asked by the Attorney General to assume that a fair rent of the river warehouse was ten to twelve cents per square foot for capitalization purposes. No objection was made to this line of questioning until the witness was asked to assume a factor of 6% for deductions for care and management of the property. The plaintiff now claims that no objection was made because of the express representation of the Attorney General there would be evidence to warrant the assumptions made.

Witness Murphy, a man of wide experience in the general real estate business for forty-three years, appraising, buying and selling all kinds of real estate throughout New England, including industrial property, testified the warehouse had a rental value of twelve cents per square foot and that in forming this opinion he drew on the experience of some thirty years specializing in appraising all types of mill property throughout the New England area. He also testified that the established rate for care and management was six per cent of the income. This evidence based on the witness' experience and knowledge was competent to supply the missing link in the hypothesis assumed by the Attorney General in his cross-examination.

As in *Edgcomb Steel Co. v. State,* 100 N. H. 480, plaintiff's counsel again urged that despite that decision the Trial Court erred in not allowing it to show its expenses in moving its equipment, machinery and wool out of the river warehouse. We see no reason to revise our decision in this respect.

Other arguments and exceptions of the plaintiff, including the exception to the denial of the motion to set aside the verdict, have been considered although not discussed in detail herein. We are of the opinion they do not disclose any prejudicial error.

*Judgment on the verdict.*

All concurred.