Rockingham
No. 6657

JOSEPH FUSEGNI & *a.*

v.

PORTSMOUTH HOUSING AUTHORITY

March 29, 1974

*Calderwood & Ouellette* and *Joseph G. Carleton, Jr. (Mr. Carleton* orally) for the plaintiffs.

*Gerald F. Giles* and *Francis S. Riordan (Mr. Riordan* orally) for the defendant.

KENISON, C.J. The primary question in this case is whether the trial court erred in permitting evidence of reproduction cost of the plaintiffs' property to be admitted for the purpose of aiding the jury in finding its fair market value. The plaintiffs' sought a determination of the amount of damages resulting from the condemnation of their property by the Portsmouth Housing Authority pursuant to RSA 498-A:27 (Supp. 1973). A trial by jury, without a view, resulted in a verdict for the plaintiffs in the amount of $41,500. The Trial Court (*Morris,* J.) denied the defendant's motion at trial to suppress evidence of the reproduction cost and its motion to set aside the verdict, and reserved and transferred the defendant's exceptions thereto.

The Portsmouth Housing Authority, a corporation duly formed under RSA ch. 203, filed an application for funds with the Department of Housing and Urban Development in 1963 for planning funds for the Vaughan Street Urban Renewal Project. The purpose of this project was to redevelop blighted areas as defined by RSA 205:2. The project covered approximately thirty acres near the Portsmouth business district and involved the taking of 177 parcels of land, one of which belonged to the plaintiffs. On January 24, 1972, the date the plaintiffs' property was taken, most of the area had been cleared.

The house on the plaintiffs' parcel was one of fourteen houses which were preserved and relocated as part of the redevelopment project. This three-story colonial house, known as the Sherburne House, was originally built in 1725 as a single-family residence. That use continued until 1942, when the plaintiffs purchased and converted the building into a two-family dwelling. In 1956, the building was converted into a four-family dwelling and continued as such until the date of taking. Many of the colonial features of the house have been preserved in excellent condition, including scrollwork above the entryway and windows, wood panelling, wide floor boards and eight fireplaces, at least one of which is constructed of Italian marble.

A preliminary question raised by the defendant is whether the trial court erred in denying its requested instruction that the jury was "not entitled to consider any increase or enhancement in the value of Mr. Fusegni's property due to the redevelopment project and the proposed improvements to the area." While we agree with the defendant that he has correctly stated the general rule (*see* 3 Nichols, Eminent Domain § 8-61, at 53-54 (rev. 3d ed. 1965); *Emmons v. Utilities Power Co.,* 83 N.H. 181, 189, 141 A. 65, 70 (1927)), a review of the record reveals that there was no suggestion in the course of trial that any enhancement of the values in the area should be taken into account as evidence of the fair market value. In fact, there was considerable evidence to the contrary as to the deterioration of the neighborhood in the vicinity of the plaintiffs' property, especially from the time when the project was announced and property owners ceased to maintain their dwellings. Whether an instruction on a particular issue is necessary to assist the jury in making its verdict is within the sound discretion of the trial court, and we do not believe that this discretion was abused here. *Donato v. Boutin,* 114 N.H. 65, 314 A.2d 677 (1974); *Amoskeag-Lawrence Mills, Inc. v. State,* 101 N.H. 392, 399-401, 144 A.2d 221, 226-27 (1958).

The principal issue is whether the trial court erred in admitting testimony on the reproduction cost of the plaintiffs' house as evidence of its fair market value. The plaintiffs' expert witness gave his opinion that the reproduction cost of the structure less depreciation was approximately $50,000 and testified that this figure represented the upper limit of its fair market value. The defendant claims that this evidence was prejudicial and contrary to a fair consideration of the market value of the property. In particular, it argues that the authorities caution against the use of the reproduction cost where the environment has so changed that this cost bears no fair relation to the actual value of the whole property.

The law of this State is in accord with the weight of authority which permits the use of the reproduction cost

of a structure less depreciation as evidence of its market value where the structure is unique or has special characteristics not found in other comparable properties. *Amoskeag-Lawrence Mills, Inc. v. State,* 101 N.H. 392, 395, 144 A.2d 221, 223 (1958); *Trustees &c. Academy v. Town of Exeter,* 92 N.H. 473, 486, 33 A.2d 665, 674 (1943); 5 Nichols, Eminent Domain § 20.2 (rev. 3d ed. 1969); Greene, *Eminent Domain in New Hampshire,* 1 N.H.B.J. 12, 19 (April 1959); Sackman, *The Limitations of the Cost Approach,* 36 Appraisal J. 53 (Jan. 1966). However, as a precondition to the use of such evidence, it is necessary to establish that the structure is adapted to the land. 2 L. Orgel, Valuation under the Law of Eminent Domain § 191 (2d ed. 1953). While the term "adapted" has not been defined with any degree of certitude by the courts, it generally has been treated as a qualitative standard under which the nature and use of the structure are considered in reference to the physical environment. *Id.* If it can be said that these elements are so related to each other that the actual structure adds value to the property, then the reproduction cost may be utilized. It should be noted that "[a]lthough [the reproduction cost is] admissible as an element or circumstance to be considered along with all other circumstances in arriving at a proper award, it is not admissible as a measure of damages. This rule stems from a recognition of the fact that reproduction cost evidence almost invariably tends to inflate valuation. This is so because the reproduction cost of a structure sets an absolute ceiling on the market price of that structure, a ceiling which may not be, and frequently is not, even approached in actual market negotiations. When this inherently inflationary attribute of reproduction cost evidence is considered in light of the misleading exactitude which such evidence almost inevitably imparts to a jury unsophisticated in the niceties of economics, the justification for placing substantial safeguards upon its admission is apparent." 5 Nichols, Eminent Domain § 20.2, at 20-17 - 20-21 (rev. 3d ed. 1969); 2 L. Orgel, Valuation under the Law of Eminent Domain §§ 188-92 (2d ed. 1953).

In this case the testimony is clear that the plaintiffs' property is a unique and well-preserved colonial structure with considerable intrinsic value. While the condition of the neighborhood somewhat lessens the desirability of erecting the building at its present location, it is not so ill-suited to the surroundings to render evidence of the reproduction cost without merit, especially in view of the fact that the deterioration accelerated after the Vaughan Street Project was announced in 1963. Kanner, *Condemnation Blight: Just How Just Is Just Compensation,* 48 Notre Dame Lawyer 765, 803-08 (1973); Sackman, *Condemnation Blight – A Problem in Compensability and Value,* Inst. on Planning, Zoning and Em. Domain 157 (1973). The jury was cautioned that the reproduction cost represented the upper limit on the value of the structure. In addition, the reproduction cost was only one of three methods utilized during the course of trial to enable the jury to establish its fair market value. The plaintiffs' expert testified that the income generated from the rental of its apartments less expenses had a capitalized value of $44,250. The defendant's expert, on the other hand, determined the worth of the property at $20,500 based on both a capitalized income or comparable sales approach. Both experts presented detailed evidence in support of their opinions and were subjected to cross-examination.

It has been said that "[t]he search for 'fair market value' is a snipe hunt carried on at midnight on a moonless landscape." Bigham, *"Fair Market Value", "Just Compensation", and the Constitution: A Critical View,* 24 Vand. L. Rev. 63, 90 (1970). In our view fair market value is particularly elusive when it is an eighteenth century colonial home of historic value, but presently used for rather mundane purposes. Accordingly, we do not believe that the defendant's rights were prejudiced by the introduction of the reproduction cost. *Dover Housing Auth. v. George,* 107 N.H. 202, 208, 220 A.2d 156, 161 (1966); *see Lebanon Housing Auth. v. National Bank,* 113 N.H. 73, 76-77, 301 A.2d 337, 340 (1973); *cf. Holmes v. State,* 109 N.H. 319, 251 A.2d 320 (1969). The jury was entitled to give such weight as it

thought proper to the testimony of the experts. *See Roy v. State*, 104 N.H. 513, 516, 191 A.2d 522, 524-25 (1963); *Stratton v. Jaffrey*, 102 N.H. 514, 516, 162 A.2d 163 (1960). Although the verdict was greater than the market value proposed by the defendant's expert, it was less than that suggested by the plaintiffs, and is not unwarranted by the evidence. *Dow v. State*, 107 N.H. 512, 517, 226 A.2d 92, 96 (1967); *see Crawford v. State Highway Bd.*, 130 Vt. 18, 24-25, 285 A.2d 760, 764-65 (1971).

*Defendant's exceptions overruled.*

All concurred.