Rockingham, June 25, 1943. } No. 3421.

TRUSTEES OF THE PHILLIPS-EXETER ACADEMY *v.* EXETER.

*Demond, Sulloway, Piper & Jones* (*Mr. Piper* orally), for the plaintiffs.

*Robert W. Upton* and *Batchelder & Wheeler* (*Mr. Upton* orally), for the defendant.

ALLEN, C. J.   I. The plaintiffs' exceptions (b) to (p) inclusive as they appear in the transfer of the case are overruled.   They raise the same questions decided in the transfer of three of the cases in 90 N. H. 472, and reconsideration of them is denied.

II. Certain preliminary questions arising upon the defendant's exceptions are first considered.   One relates to the taxability of two items of property.   Of these two items, it is claimed that the Administration Building is partly taxable, "because the administrative work relating to the dormitories [and dining halls] is carried on there."   While the dormitories and buildings so far as used for dining halls are taxable, it does not follow that their administration is not a service of exclusive educational use.   The administration is understood to include the control and regulation of the properties, their financial operation, and the accounting and auditing pertaining to their management and conduct.

Administration of the Academy is necessarily more than a mere governing agency over the students and the curriculum.   Oversight of all the Academy's property is an incident essential to the maintenance of its educational benevolence, and fairly property devoted to that oversight is in direct and exclusive use for its institutional purposes, as much as its gymnasium and infirmary.   The service is analogous to that of the caretaker who had oversight of rented and other property of a charity and whose occupancy of a dwelling house of the charity was held to be that of the charity, as considered in *Hedding &c.·Ass'n* v. *Epping*, 88 N. H. 321, 324.   The Administration Building remains wholly tax exempt.

Another item of property is an open area of over an acre on the south side of Front Street.   It is opposite the main campus in front of the Academy Building on the north side of the street, and is carved out of an area in which are located the Davis Library, the Principal's House and a number of dormitories.   As appears, "It is occupied only by a flag pole, and is really a part of the Academy set-up, and which the court finds is not taxable—if sold and built upon the value of the property south of it would be materially and disadvantageously affected thereby."

It was held in the case in 90 N. H. at *p.* 506 that the taxability of unoccupied land "maintained as a part of the Academy campus and grounds" "depends upon its appropriation in proportion be-

tween taxable and non-taxable buildings." The tract here considered is to be governed by the same rule. The Academy "set-up" is construed to include dormitories and other taxable structures. The reference to the effect of a sale of the tract upon other property indicates that dormitories are a part of the set-up. It follows that the tract should be apportioned between taxable and non-taxable uses, in connection with which the Academy property on the north side of Front Street may be properly considered, so far as the street may be regarded as only a physical severance without being an integral one. The tract may fairly be found to be a supplementary extension of the campus and grounds north of the street. The case is recommitted for revision of findings on this ground.

III. The defendant's exception to the finding of the qualifications of Mr. Percival to testify to the value of the plaintiffs' lands and buildings is overruled. The trial court was entitled to find from the evidence of his special fitness in experience and knowledge that his opinion would probably be of some aid. *Watkins* v. *Company*, 88 N. H. 476; *Weiss* v. *Wasserman*, 91 N. H. 164, 166; *Cedergren* v. *Hadaway*, 91 N. H. 270, 271; *Freeman* v. *Scahill, ante,* 471. The facts in *Wood* v. *Insurance Co.*, 89 N. H. 213, are not such as to govern here. There a layman possibly from Bethlehem was regarded as unqualified to estimate the value of real estate in Lebanon over fifty miles distant by air-line and much farther by travel, with only examination of the property made and certain evidence heard by him. An expert familiar with values in the vicinity is comparable only by contrast. The former could not, while the latter could, be found to have an opinion of some helpful value.

IV. In all of the six cases transferred the trial court allowed the institutional exemption of $150,000, for which the statute (R. L., *c.* 73, *ss.* 24, 25) provides, in addition to the exemption of the real estate of seminaries of learning (R. L., *c.* 73, *s.* 7). Prior to 1930 all educational institutions were entitled to the institutional exemption. In that year an amendment (Laws 1930, *c.* 4, *s.* 1) was enacted which required that to be entitled to the exemption as an educational institution it must "have a curriculum regularly approved by the state board of education and in which training is" "given for at least six months of each calendar year." The amendment has remained in force, with a slight change. The institution must "conduct regular courses of instruction, under a curriculum approved by the State Board of Education," and for the same yearly period of at least six months (R. L., *c.* 73, *s.* 24). So far as the

change is more than verbal, it is not here material. The Academy has never had its curriculum approved by the State Board.

In the former transfer of three of the cases, no issue was raised over the Academy's failure to obtain the approval of the State Board, and the defendant, denying all other exemptions, conceded the plaintiffs' right to that of $150,000. The 1930 amendment was wholly disregarded in any bearing or effect. For the purposes of the transfer, it was ignored as though it had not been enacted. It follows that under the principle of *res adjudicata* any claim that the amendment may now be considered in connection with the petitions upon which the former transfer was brought is not maintainable.

But as to the other petitions upon which the present transfer is brought, the decision in the former transfer was no declaration that the amendment is inapplicable to the Academy. The amendment, being there unobserved and treated as non-existent, its construction now becomes a subject of *de novo* treatment.

One position taken by the plaintiffs is that "the obvious intent of the legislature was to prevent fly-by-night private schools from enjoying the exemption." The difficulty with this position is that, conceding the intent, the language used does not manifest it. The language embraces all private educational institutions with no exceptions. However foolish and arbitrary the amendment may be thought to be in application to institutions of such high standing and permanence as the Academy, the legislative will is to be found in the enacted expression of it. The ascertainment of actual intent or oversight, in conflict with the expressed intent, cannot prevail as a method and rule of judicial construction. While as between a reasonable and unreasonable meaning of the language used, the reasonable meaning is to be adopted, yet if the language is clear in having only one meaning, it must be adopted, however unreasonable it may be in its applications or in some of them. The courts have no function of redrafting legislation in order to make it conformable to an intention not fairly expressed in it. The amendment as it reads is unqualified, and relief from its inappropriateness, incongruity and obduracy must be sought through further legislative action.

In further contention, the plaintiffs aver the unconstitutionality of the approval clause in the amendment as an undue delegation of legislative powers. They base their position on the ground that there is an "insufficiency of a declared policy and of a prescribed standard" (*Ferretti* v. *Jackson*, 88 N. H. 296, 302) setting forth the

State Board of Education's field of consideration in extending or withholding approval of an institution's curriculum.

Whether the amendment, if its approval clause is invalid, is thereby wholly invalid, is an inquiry not here needing or given answer. The Academy cannot be charged with any omission which does not meet the other demands of the amendment. It maintains regular courses of instruction for at least six months in each calendar year. Any general reference herein to the amendment is to be understood to be restricted to confinement to the approval clause, in discussion of its validity.

As to argument that the effect of the invalidity of the amendment is to destroy the institutional exemption in its entirety, the answer is: "It is universally held that a valid act is not affected by the enactment of a void amendment, even if there are words of express repeal, unless it is clear that the legislature intended such repeal." *Williams* v. *State*, 81 N. H. 341, 353, reaffirmed in *Foster* v. *Farrand*, 81 N. H. 448, 451, and *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 5. It cannot be successfully asserted that the amendment, if held void, was clearly intended to be effective as a repeal of the exemption. Voidance of the condition would leave the exemption in force and freed from the condition.

While reasonableness of action upon a curriculum is an implicit demand of the amendment (*Willis* v. *Wilkins, ante,* 400, and cases cited), that duty alone is not an adequate test of proper delegation. A policy and standards must be announced within which action must be reasonable. Unfettered delegation of authority is forbidden. It is an attempt of the legislature to divest itself of the full and complete exercise of its functions in respect to the subject-matter of delegation, and to confer them upon a state agency with uncontrolled discretion equal to its own in the adoption of a policy and standards. Without some policy and standards to guide it, the agency is as unbridled as the legislature itself in the discretionary power sought to be bestowed upon it. The legislature itself may not act arbitrarily in disregard of the rule of equality.

The attempted delegation of power here leads to striking repercussions of its exercise. An educational institution established for no personal profit and serving only the public benefit is a charity, upon which the legislature may bestow special benefit not extended to other charities of the same class and nature. The charity being solely a form of public service, a grant to it is for public use and benefit. The grant is not open to attack as a violation of the com-

mand of equality. This has been "seldom questioned and never denied." It follows that the legislature in granting exemptions to charities may do so in special instances as well as under general formulas. It is not favoritism, since only the public is served, and the grant is not arbitrary. The grant here to the State Board of authority to approve a curriculum makes no reservation of the legislative power of approval in special instances. The Board may act as though it stood in the legislature's place. The approval clause requires each curriculum to be passed upon, and whether under isolated consideration or under some comprehensive plan and program for all cases, the Board is free to act. Conceding its duty to entertain only educational considerations, the educational facilities of a particular institution may reasonably be dependent upon economic factors. Any reasonable ground for approval may be taken by the Board, and a given institution's purpose or ability in confinement, extension or character of its curriculum may be a proper consideration in taking discretionary action.

The legislature in its power of special approval may grant it on terms. The approval clause, containing no qualifications, seeks to assign to the Board this incident of its powers. Indirect control by the Board over such institutions as might be willing to submit to it for the sake of the institutional exemption would be accomplished in large measure. The possible lack of uniformity, by special requirements for each institution which became an applicant, as conditions for obtaining approval of its curriculum, becomes apparent. While such control may be assumed by the legislature, its assignment shows the extent to which the approval clause goes.

Again, the clause indirectly confers taxing power upon the Board. Since by the clause it may extend or withhold approval in a given instance, it may in result grant or deny an exemption from taxation. The taxing power is fundamentally vested in the legislature, and exemption from taxation is an exercise of the power. So far as it may be delegated, the delegation must be regulated by some definition of policy and purpose. Any delegation by which generally or in individual instances the power to tax, including that to exempt, is conferred, must be thus controlled.

It thus seems clear that the approval clause is invalid as an excessive delegation of legislative power. In the absence of any prescribed objectives to be attained, the scope of the Board's freedom of discretionary action is too broad and unconfined. The assignment of the power is too great an invasion of the separation of the

legislative from the other departments of government.    The legislative will becomes unduly abdicated in favor of an executive agency.

V.  The most serious issue in the case is of the trial court's methods and tests in finding value.    The defendant stresses the claim of excessive under-valuation by their adoption and urgently seeks the employment of other criteria.    In sufficient accuracy of statement, it advocates a rule that when property serves a use available wholly or in substantial measure only to the owner, the value to him is the value for taxation, rather than the price for which he can sell it, and with replacement value less depreciation determining value to him.

The problem in its factual aspects is one of difficulty.    It arises from the character and use of the Academy's taxable property, of which a large part is so specialized for use that it is unsalable at a figure above that found as its value, although its cost, either actual or reproductive, is far in excess of that figure and although the property is in the best of condition.    Many of the buildings are of recent construction, and are in active use as accessory and incidental to the establishment and maintenance of the Academy as an educational institution.

Judicially, the problem whether value is value to the owner or sale value in a case like this is one of statutory construction, and the legislative thought and will as expressed in the pertinent enactments is to be ascertained.

As the statute immediately applicable reads: "The selectmen shall appraise all taxable property at its full and true value in money as they would appraise the same in payment of a just debt due from a solvent debtor . . . ," R. L., c. 76, s. 1.    It has been in this form for at least a century, except that the phrase for appraisal of property in payment of a debt was added by amendment in 1872 (Laws 1872, c. 31, s. 1).    The required oath of assessors is in literal correspondence with the statement of their duty.    R. L., c. 76, s. 7.

The statute has been uniformly and consistently construed to give to value the limited meaning of sale value.    The definition has gone unchallenged until now that "Such value is the market value, or the price which the property will bring in a fair market, after reasonable efforts have been made to find the purchaser who will give the highest price for it" (*Winnipiseogee Lake &c. Co.* v. *Gilford*, 67 N. H. 514, 515).    Adjustment of price between buyer and seller, with their respective interests to buy and sell on the best obtainable terms only to be considered, is the cardinal rule.

In construing the statute, the amendment is an important phrase to be examined. The defendant undertakes to devitalize it by reasoning that a solvent debtor will always redeem for whatever the property set off is worth to him, and therefore the creditor should take it on that basis. In this view the debtor stands as a purchaser ready to buy. The reasoning leads to the conclusion that whatever the amendment was intended to accomplish, the purpose is unexpressed and it therefore accomplishes nothing.

But the courts do not assume that legislative acts are idle and meaningless in purpose, and if the language used may in reason express some purpose and effect to be given it, it must be read in that light. Clearly the amendment requires valuation for the taxation of general property to be determined on the same basis as that for setting off property to a creditor in payment of a debt. The creditor is to receive the equivalent of payment in money, no more and no less.

The occasion for the enactment of the amendment, so far as the evidence goes, is the discussion of value for taxation by Judge *Doe* in his opinion in *Cocheco &c. Co.* v. *Strafford*, 51 N. H. 455, decided shortly before the passage of the amendment. The amendment being prompted by the discussion, the discussion serves to explain its meaning and purpose in defining value for taxation. To quote at some length from the opinion (*pp.* 480, 481, 482):

"Nothing can be more fallacious than the idea that the amount which the owner of a piece of property would give rather than be deprived of it, is an absolute and conclusive test of its fair market value. . . . When it is said, as it sometimes is, that the value of property is what it is worth to the owner, this test of value is not to be understood to be the cost of restoring the property if it were so changed as to be, figuratively speaking, destroyed; but the test is to be understood to be the fair market value, that is, what the owner could have sold the property for at a fair sale, at the time it was destroyed. . . . But in this case of taxation the property is to be appraised at its fair market value. . . .

"When property is to be appraised at what it is worth, the use of terms descriptive of value is unnecessary. The value need not be required to be [stated as] the real, full, true, just, fair, salable, market value in money, no more and no less. No one would suppose that the value is to be an unreal, partial, false, unjust, unfair, unsalable, or unmarketable value, or in anything else than money, or more or less than the property is worth, unless a departure from the usual course of business and the ordinary meaning of value were marked

out by the law in an unmistakable manner." *Cocheco &c. Co.* v. *Strafford,* 51 N. H. 455, 480–482.

Thereafter in the opinion (*p.* 482), this remark appears: "The usual rate in farming towns is well understood; and the practice of undervaluation is so universal as to raise a presumption of fact that it prevails in Strafford."

From this evidence it would appear that the legislature, in recognition of the practice of undervaluing certain forms of property and thereby taxing other property disproportionately, undertook to make definite the existing test of value by more explicit statement, and did so by unequivocal adoption of the test of value the amendment prescribes. It is true that it is primarily only a restatement of the existing law by reënforcement of it, but the restatement embodies a positive rule for determining specially how "full and true value in money" shall be ascertained. While the amendment makes no change in the existing measure of value, leaving it in fact as the salable or market value, it emphasizes the measure by giving it added definitive force. The adoption of the rule may not be ignored, and the method for valuing property set off to a creditor requires notice.

In its test, the underlying principle in set-off is that the creditor shall receive property equal in value in money to the amount of his debt. He is to be as well off in property resources as though the debt were paid in money. ". . . it is the duty of the appraisers to set off the land by metes and bounds, and to estimate its value in money." *Mead* v. *Harvey,* 2 N. H. 495, 497. ". . . it must be understood that the appraisers estimated the entire tracts at their just value." *Fletcher* v. *Bank,* 37 N. H. 369, 389. When the land is worth less than the amount of the judgment the debtor may redeem by payment of its value as appraised. *Burnham* v. *Aiken,* 6 N. H. 306, 325, 326.

The defendant's argument ignores the legislative conception of an assumed transaction. The appraisal in set-off is made as though it were a sale with full loss of rights in the property. A sale connotes that the owner parts with his title with no plan or prospect of his repurchase. The statute of set-off carries no implication of a debtor-creditor relation united in the debtor as one person. The thought of an actual owner and an actual or indefinite purchaser, as two distinct persons is inherent. An exchange of property for money is the objective of attention, without allowance for placing either party in the position of the other and thereby leading to the assumption that one of the parties may be both seller and buyer in

the assumed transaction of sale. It is not what the property is worth to keep or take back, but what it is worth to sell to others than the prior owner, that is the viewpoint.

If the interest to keep or to repurchase were the basis of value, the standpoint of a price which a sale would bring would become discarded. The right of the creditor in set-off is to be free from the chance of the debtor's repurchase. The amount he should allow for the property, in legal principle, is not measured by the amount the debtor will pay rather than lose the property or to regain it. Obviously, if the debtor is the sole prospective purchaser, he is in a position to bargain with the creditor ready to sell. In any bargain ordinarily each party takes advantage of the other's purpose, needs and desires to transact the business. Each strives for the most favorable terms for himself. This is the business practice of men in their contractual relations, and applies to sales. In determining value for set-off the owner is exiled as a prospective purchaser. That he may subsequently become a customer is out of consideration. Value to the creditor determined by value to the debtor is not the measure.

The advantage to the solvent debtor in his option to redeem within a year from a set-off in execution is a disadvantage to the creditors. Rarely will the debtor who is solvent see his property set off unless he is ready to part with it without thought of repurchase. The statute conveys the thought of his elimination as a customer in the market. His position as a repurchaser is the same as that of a seller, whom the buyer omits as being in the market for it. A seller, having sold, is out of the market and is not thereupon and merely because he is no longer an owner, a prospective purchaser. If he subsequently becomes one, it is without relation to his prior sale. He was in the legislative mind only as one whose property which might be set off was sufficient to pay his debts in full and which might be sold by the creditor to a third person for the exact amount due him, no more and no less. The legislators as laymen understanding the normal workings and affairs of business dealings are assumed to have acted in observance of them. No other sensible and practical meaning can be given the amendment, as it reads.

The set-off rule for measuring value has been invariably followed in defining value for other purposes. In *State* v. *James*, 58 N. H. 67, a case presenting the question of value under the larceny statute, the court held it to be market value, and that evidence that the property "is worth twenty dollars to its owner, and worth nothing to any-

body else, does not show its market value to be twenty dollars." In *Amoskeag &c. Co.* v. *Worcester*, 60 N. H. 522, 526, and *Low* v. *Railroad*, 63 N. H. 557, cases of eminent domain, the same measure of value was held to be that to be employed. In *Stevens* v. *Fellows*, 70 N. H. 148, the definition was held to govern in connection with the value of property foreclosed under a mortgage. In *Grafton &c. Co.* v. *State*, 78 N. H. 330, a case of utility regulation, the same test of value was invoked in this language (*p.* 334): "The value of property is what it is worth in money, what it will bring in money to the seller or what it will cost the buyer in money to obtain it"; with recognition that the property had no "market value in the ordinary sense." The rule was affirmed in *State* v. *Company*, 91 N. H. 278, 284, a utility rate case. Many other illustrations are found in the opinion in *Cocheco &c. Co.* v. *Strafford, supra,* 481, 482.

Further force to show that the concept that property for purposes of taxation may be worth more than can be obtained for it does not prevail in our state, is found in *Arlington Mills* v. *Salem*, 83 N. H. 148, where it is said (158): "It is sometimes good business to pay more for a thing than it will sell for in the market." The converse is equally true that it may be bad business to sell a thing for what it may thus be sold. In either event the special and exclusive advantage to the owner is personal to him, rather than pertaining to the nature of the thing. A share of minority stock in a corporation is equal in value to one of majority stock, in the taxable sense, although the advantage of holding majority stock may be far greater than of holding minority stock.

In some confirmation of this legislative test of value the tax is upon the property, and not upon its owner. Although a resident owner is personally liable, his liability is secondary under the heading of Property Taxes as other than that of Poll Taxes, "Real Estate, . . . is liable to be taxed." R. L., *c.* 73, *s.* 7. The tax is always regarded as a property tax. Ownership has been defined as a collection of rights to use and enjoy property. One of the rights is to transmit it to others. It is this right of transmission which is to be valued for taxation. Not only does the amendment which has been considered measure value by a method of transmission of the same nature as a sale, but it would be beyond all reason if nontransmissible rights special to the owner were elements of statutory value. Whether such rights are peculiarly economic to him or are otherwise of special personal importance, they have no taxable value. Love of home, and ancestral ownership may be mentioned

as giving personal value not taxable. And use which only the owner can make is of the same character. The value of property is not enhanced because the owner uses it as an inventory laboratory.

The legislative view of value, as disclosed by the statute both before and after its amendment and as has been judicially construed, is thus based upon the conception of two parties, one the actual owner and one of some actual or indefinite person, each assumed respectively willing to sell and to buy.

The foregoing views are believed to answer the defendant's argument that replacement cost, less depreciation, should be controlling in finding value in the case. The argument is predicated upon that of value for the owner, which, failing, involves the failure of its dependent. The normal rule of value permits evidence of all relevant factors to be received for the formation of the finding, in analysis an opinion, of the trier of facts. It includes this factor of replacement cost, to be given greater or less weight by the trier in the formation of his opinion as he may estimate it. But the statute implies no required use of it as an exclusive measure. On the contrary, consideration is to be given to all pertinent factors having bearing on value, as the statute is held to define value.

The finding, as an opinion, may for good reason discredit the opinions of all witnesses and thus be lower or greater than any of them. The finding arrived at is based on all the elements of value of which evidence has been received. The plaintiffs' exception to an overvaluation is overruled.

Disregarding use which can be made only by the seller, if the property is available to others for use which he has made of it, such transmissible use is of material bearing in estimating value. In the condemnation of lands the inquiry of value is: "What, from their availability for valuable uses, are they worth in the market?" *Low* v. *Railroad*, 63 N. H. 557, 561, 562. The uses are such as have been or may be made of them. The rule is the same in valuation for taxation. " . . . the property in any thing consists in the use" (*Arlington Mills* v. *Salem, supra,* 156), and all uses of which the property inherently and in its own character are capable serve in the reflection of value. Together with inquiry into original and replacement costs, what can be done with the property, to what uses can it be put, what advantages does it have in itself and with reference to other property, what income does it or may it be made to produce, and what profit may be derived from it, are all relevant collateral issues in connection with the ultimate issue of value. But

uses dependent upon the personal element of the user are not an element of the property in its transfer, payment for which is the keynote of value.

Granting that there may be a real and practical need for special measures of value when the standard rule heretofore declared produces extreme divergences between value to the owner and value determined by applying the standard rule, the remedy is to be sought by legislation. For the courts to undertake to prescribe and provide the remedy is to assume legislative power denied them. It would lead to decisions based on economic and social considerations of policy in governmental matters. Between the two theories of market value and value to the owner, the courts properly have to say which has been, and not which should be, adopted by the law-making body.

It is thought that in the effort to conform legislation on the subject to situations where fairness and justice were felt to demand special rules, courts in other jurisdictions have entered a province not their own. The problem has been made one of judicial valuation. The result has been to set up exceptional definitions of value in exceptional cases, and to involve the courts in the solution of questions which amounts to an enactment rather than a declaration of the law. And in the effort to maintain the appearance of declaration, much straining of meaning and confusion of language has emerged. It has been said that "value is a word of many meanings" *Missouri (ex rel Company)* v. *Commission*, 262 U. S. 276, 310. This is quite true (see 66 C. J. 418–424). But it does not mean that it may have varying meanings in a given instance of the use of the word. Value for taxation may differ from that for other purposes, but a duly enacted test of it applicable in general may not be supplemented by a special and different test required to meet cases regarded as of hardship, in the absence of enacted provision therefor. The line between construction and amendment is at times a narrow one, but the expression of intent may not be altered merely because the expression leads to results of hardship, probably not in fact intended or thought of. There is no choice here of two meanings of which a statute is susceptible, upon a fair examination of its history and the construction heretofore put upon it. One single test of value, however troublesome in application to special situations, or even generally, is all that it lays down, and no range of judicial freedom to qualify it by more suitable tests in such situations appears in the statute. The case is one where the rule being clearly an-

nounced, its wisdom and practicality are not to be reviewed. New and unforeseen conditions and situations may come within the purview only as its language is designed to adapt itself to them. The process of construction fits or unfits the law to the facts, and not the facts to the law. Qualification of legislation, however reasonable and desirable, and even to carry out the actual thought of the legislature if there was thought about it, is not to be made under the guise of declaration of the law. Whatever the broad legislative policy, it cannot be upheld in the face of inconsistent legislation.

*Attorney-General* v. *Caldwell, ante,* 216. Substitutions, qualifications and variations of enacted law are beyond the judicial prerogative. The trial court employed the statutory requirements in his estimate of values.

*Exception sustained as to flag pole area;*
*all other exceptions overruled.*

All concurred.