489 P.2d 1219

**COUNTY OF PIMA et al., Appellants,**

**v.**

**TRICO ELECTRIC COOPERATIVE, an Arizona public service corporation, Appellee.**

**No. 2 CA–CIV 919.**

Court of Appeals of Arizona, Division 2.

Oct. 27, 1971.

Rehearing Denied Dec. 20, 1971.

Review Denied Jan. 18, 1972.

Gary K. Nelson, Atty. Gen., Phoenix, by James D. Winter, Asst. Atty. Gen., and Robert N. Hillock, Sp. Tucson Asst. Atty. Gen., for appellants.

Norman S. Hull, Tucson, for appellee.

KRUCKER, Chief Judge.

Trico Electric Cooperative filed actions in three counties, Santa Cruz, Pinal, and Pima, seeking refund of 1969 property taxes paid by it under protest. These actions, pursuant to A.R.S. §§ 42-146 and 42-147 were consolidated and tried in Pima County Superior Court.

The trial court found that the $3,298,000 valuation of Trico's property for 1969, as made by the Department of Property Valuation was excessive and that the full cash value thereof was $2,250,000. Judgment was subsequently entered in accordance therewith directing the respective counties to refund to Trico a specified sum as excess tax.

Trico owns and operates an electricity distribution system in rural areas of Pima, Pinal and Santa Cruz counties. It services no municipal areas and is a non-profit corporation. The general manager of Trico testified:

"Well, although we're a non-profit corporation, it would be pretty difficult to design a rate that would exactly produce the cost of doing business, so your rates are designed on a rather long-range basis to produce enough capital to pay your operating expenses, pay your interest on the loan, plus the principle payments back to the government. And, incidentally, those principle-interest payments are done quarterly, then if these rates produce more income than the cost of doing business, it is—it winds up as what we call a patronage margin. It's just the money you get from your members over and above the costs of doing business and then as I explained before, this money is taken in some cases and invested back into the plant or put into investments or returned to the members as a patronage capital dividend, if you want to refer to it. It's really refunding this money that they made over and above the cost of business. This is the way you stay non-profit."

He testified that the rates are designed to have a slight margin since it was impossible to figure the exact amount.

Trico's only appraisal witness, in response to a question as to what he considered to be the full cash value of the property, stated:

"Yes, my determination as to the full cash value of the property as given consideration to all of the elements of value that I outlined in my testimony, the physical cost, depreciation, obsolescence, and also looking at most importantly the earnings value, both from the standpoint of the buyer and seller, I have arrived at a figure of $2,250,000."

This witness prepared two exhibits which were admitted into evidence: A 1969 valuation of $2,080,000, his determination of earning value from the standpoint of the seller and a 1969 valuation of $2,265,000, his determination of earning value from the standpoint of a prospective buyer. The lower valuation was determined by figuring what sum, invested at a rate of 5%, would be necessary in order to realize a continued earnings of $104,000 annually. As to his computation which produced the larger valuation, he testified:

"Q. And, then, will you please go ahead and discuss Exhibit 5, which is considering the buyer's viewpoint on a proposed purchase and sale of this property?

A. There again the whole purpose of this exhibit is to develop an income statement in order to arrive at this case at the amount of money that is left over after meeting all obligations of the system that a purchaser could devote toward issuing bonds to finance the acquisition of the property.

Q. Yes, sir.

A. And in doing that, I followed, essentially, the same basic procedures by first establishing the, what I think are reasonable gross revenues for the Trico Electric system. They used a figure of $1,100,000.

Q. That is the same you used on Exhibit 4? [Valuation from the seller's standpoint]

A. Yes, sir, and then from that, deducted pertinent cost of service that such a prospecitve buyer would experience which consisted of operating expenses in the amount of $737,000, taxes $81,000, depreciation of $148,000, which leaves after deducting it from gross revenues, a balance of net revenues of $134,000. I have also estimated that other income for the prospective purchaser should be established at $40,000. In adding other income to the net revenue from the operation of the property, I arrived at a figure of $174,000 which represents the amount of money that is available for the issuance of bonds by the prospective purchaser.

Now, there again, assuming an interest rate of five percent, going out on the money market, and assuming that the borrower or prospective purchaser would attempt to secure a long-term loan which is always the case in this type of situation, he undoubtedly would get a 30-year loan and based upon a 30-year loan and five percent interest rate, this $174,000 would support a bond issue of $2,675,000. Now, out of this bond issue, the purchasers of the property would have to set aside certain monies. They would have to be monies for working capital, monies for material and supplies, monies for the cost of financing the bond issue, and for establishing an interest reserve. I have computed these amounts at $410,000 and deducting that from the total bond issue of $2,675,000 as shown on this exhibit, that leaves a balance of $2,265,000 that a prospective purchaser could afford to pay for the property."

The evidence reflects that Trico has a rate structure which produces no more than one percent on the operation of the utility. Trico's witness' computations were predicated on continuance of this rate structure. He testified that the important thing to look at, both in terms of a buyer and seller, is the net earnings *capability* of the property. His value opinion, however, was based on the assumption that a purchaser would not be free to adjust the rates in order to get a higher rate of return on his investment.

■ The appellants challenge the judgment below, contending in substance that Trico failed to sustain its burden of proving excessive valuation, i. e., the opinion of Trico's appraiser was not competent evidence. If their position is correct, Trico's failure to prove by competent evidence that the value placed on its property by the Department of Valuation was excessive, leaves the Department's valuation standing as "correct and lawful." Navajo County v. Four Corners Pipe Line Co., 106 Ariz. 511, 479 P.2d 174, rehearing denied, 107 Ariz. 296, 486 P.2d 778 (1971).

■■ We have no quarrel with the general proposition that the income from real property is a proper factor to be considered in fixing its valuation for tax purposes. See, Annot. 96 A.L.R.2d 666. Although earning power of an electric distribution system is an element to be considered, Public Service Co. v. New Hampton, 101 N.H. 142, 136 A.2d 591 (1957), assessors are not limited to consideration of only its earning capacity and other relevant factors must be considered. Maine Consolidated Power Co. v. Inhabitants of Town, 219 A.2d 748 (Me. 1966).

In the area of rental income as a factor to be considered in determining valuation for tax purposes, courts have held that the *fair* rental value should be used rather than the existing rental. E. g., Crossroads Cent. (Rochester) v. Commissioner of Taxation, 286 Minn. 440, 176 N.W.2d 530 (1970); McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 214 A.2d 526 (1965).

■ Assuming *arguendo* that an income approach was appropriate in the case

at bench, it is the *capacity* for earning income rather than the income actually derived which reflects full cash value for taxation purposes. Springfield Marine Bank v. Property Tax Appeal Board, 44 Ill.2d 428, 256 N.E.2d 334 (1970); 51 Am.Jur. Taxation § 698. The Idaho Supreme Court has held that where property is not designed to produce income, it may be appropriate to consider reasonable income rather than actual income in order to determine value for tax purposes. C. C. Anderson Stores Co. v. State Tax Commission, 91 Idaho 413, 422 P.2d 337 (1967). On the other hand, the Supreme Court of Oregon has indicated that the income approach cannot be utilized in valuing the property of a non-profit organization. Rogue Valley Manor v. State Tax Commission, 244 Or. 571, 419 P.2d 422 (1966). Trico's appraiser, while indicating that earning *capacity* was the proper criterion, in fact predicated his opinion on the income actually derived. He treated the vicissitudes of management as controlling and consequently his opinion did not consider earning capability. We hold, therefore, that his method of valuation was erroneous and lacked the requisite competence to support a finding of excessiveness. Such being the case, the value placed upon the property by the Department of Valuation must stand as correct and lawful. A.R.S. § 42-147.

The judgment is reversed with directions to enter judgment in favor of the appellants.

HAIRE and CASE, JJ., concur.

Judge JAMES D. HATHAWAY and Judge LAWRENCE HOWARD having requested that they be relieved from consideration of this matter, Judge L. RAY HAIRE and Judge WILLIBY E. CASE were called to sit in their stead and participate in the determination of this decision.