Grafton
No. 6692

NEW ENGLAND POWER COMPANY

v.

TOWN OF LITTLETON

September 30, 1974

*Orr & Reno* and *Richard B. Couser (Mr. Couser* orally) for the plaintiff.

*Dodge, Moulton & Smith* and *McLane, Graf, Greene & Brown,* and *Robert A. Wells (Mr. Arthur A. Greene, Jr.,* orally) for the defendant.

LAMPRON, J. Petitions for abatement of property taxes assessed by the town against the company for the years 1969, 1970, 1971. By agreement of the parties the cases were heard by a Master *(Arthur H. Nighswander,* Esq.), with the further agreement that his decision would have the same status as a decree of the superior court.

Following a hearing, the master made certain findings, including a finding "that the true value of the properties of New England Power Company in Littleton as of April 1, 1969, was $25,772,388., as of April 1, 1970, $25,570,242., and as of April 1, 1971, $25,610,908. The town, by its selectmen, had assessed the company's property for each of those three years at $35,050,450. The master ruled that the company was entitled to an abatement of the difference between the above true values found and the assessed values for each of the years in question. "The amount to be abated will be the amount of the abated assessment [$9,278,062., $9,480,208., and $9,439,542.] multiplied by the applicable tax rate for the year, and when paid, should be refunded with six percent interest from date of payment by the taxpayer." Defendant's exceptions to denial of its motions; to the master's rulings admitting and excluding evidence; to the granting and denial of requests for findings and rulings; and to the master's report were reserved and transferred by *Batchelder,* J., as was defendant's exception to the court's denial of its motion to return the master's report to him for corrections.

The main issue involved is the "full and true value in money" (RSA 75:1) of the taxable real estate and fixtures

owned by New England Power Company in Littleton on April 1, 1969, April 1, 1970, and April 1, 1971. The town's basic contentions are succinctly stated in its brief to be the following: "[T]he master erred in applying the law of valuation and went on to further error in his understanding and use of the different evidences of value presented, both in its treatment per se and its treatment vis-a-vis other evidence of value." The town further claims that the company failed to carry its burden of proving "with evidence which [the master] was entitled to use under the law" that it was entitled to an abatement. At oral argument the defendant expressly waived its claim that if an abatement was warranted, the formula prescribed and used by the master for the determination of the amount of the abatement was erroneous.

The property in question is a hydroelectric power facility known as "Moore Station" located on the Connecticut River between Littleton, New Hampshire and Waterford, Vermont. Approximately 90% of the project is in Littleton. It was constructed between 1951 and 1957 under a license issued by the Federal Power Commission (16 U.S.C. § 797 (e) (1970)) for a period of 50 years from August 1, 1951, to July 31, 2001. The land consists of approximately 4300 acres. In the project itself are 1900 acres permanently under water or flowed as part of the reservoir, and 1400 acres which are subject to a 40-foot drawdown by the dam and are above water. The remaining 1000 acres are above water but outside of the project itself and not subject to the terms and conditions of the license which apply to the project land. 16 U.S.C. § 799 (1970).

A dam about 5,325 feet long creates a reservoir about eleven miles in length having a usable storage of about 115,000 acre feet. Approximately four miles of it borders the town of Littleton and about 40% of the stored water for that four miles is in Vermont. There are additional sources of stored water at Second Connecticut Lake and First Connecticut Lake, owned by the company, and at Lake Francis owned by the State of New Hampshire, all of which are outside of Littleton. Being a conventional hydroelectric station it includes four turbines each connected to a generator; buildings to house the equipment; a transmission yard with transformers and

transmission lines running from the vicinity of Littleton to Tewksbury, Massachusetts. Since February 1971 the station has been completely automated at an additional cost of $500,000 over its original cost of $27,770,793. Moore "is an integral part of the New England Company complex, generating electricity which is carried out to the Company lines to meet demand." It has a generation capability of between 190,000 and 200,000 kilowatts (KW) sometimes referred to as 190 to 200 megawatts (MW).

The demand for electricity varies greatly from day to day, season to season, and hour to hour within each day. For New England, the highest demand is in December and a smaller peak in midsummer. The demand is met by three kinds of generating plants: a base load plant which is designed to run at a constant rate 24 hours a day; an intermediate cycling plant which can come on line during periods of high demand; finally by a peaking plant which does not run any-where near capacity but which should be ready to take care of the extreme peaks of demand for relatively short periods of time. Conventional hydroelectric plants, such as Moore, fall in the latter category, although to a certain extent Moore can serve also as a cycling plant especially in periods of high runoff. These occur, however, in the spring which are low demand months. Moore's average operation is at less than twenty percent of capacity, its annual capacity factor being 13.5%.

With the advent in the 1950's of the reversible turbine, "pumped storage" plants became available. Water is pumped from a lower reservoir to a higher one by cheap off-peak power. In periods of high demand the turbines are reversed and the water running down again into the lower pond gener-ates electric energy. It takes 3 KW to pump water for every 2 KW of returned useful energy. These plants have an advan-tage over conventional hydro plants like Moore in that they can be a dependable year-round source of power.

The parties made the following stipulations. The property generally in Littleton, other than the property of the com-pany, was assessed for the three years 1969-71 at amounts, the sum of which represented its "full and true value in money" as required by RSA 75:1. The highest and best use

of the project property is for the generation of electric power. The value of the nonproject property was $43,760 for the three years·in question. The town appraisal of $35,050,450 for each year was $6,040,680 for land ($43,760 to be deducted) and $29,009,770 for buildings and equipment.

RSA 75:1 reads as follows: "The selectmen shall appraise all taxable property at its full and true value in money as they would appraise the same in payment of a just debt due from a solvent debtor, and shall receive and consider all evidence that may be submitted to them relative to the value of property the value of which cannot be determined by personal examination." It is agreed that this same standard was to be applied by the superior court, the master in this case, in determining whether or not the company was entitled to an abatement. *Edes v. Boardman,* 58 N.H. 580, 584.(1879). Although their calculations differed in many respects, the experts presented by each party agreed that there are five approaches to valuation. They are: (1) original cost less depreciation; (2) reproduction cost less depreciation; (3) comparable sales; (4) capitalized earnings; (5) cost of an alternative facility capable of delivering an equivalent amount of power and energy.

Under original cost less depreciation both sides arrived at substantially the same value in the form of year end figures adjusted to reflect the value as of April 1 of the following year. They were as follows: 1969, Company $24,090,896, Town $24,085,478; 1970, Company $23,767,222, Town $23,744,304; 1971, Company $23,889,203, Town $23,848,500. The reproduction less depreciation values presented were as follows: 1969, Company $31,504,707, Town $40,350,000; 1970, Company $32,430,930, Town $42,829,000; 1971, Company $33,883,736, Town $45,885,000. Under comparable sales, no figures on value were submitted as no sales of comparable projects had taken place. There was evidence presented to the effect that the value of hydroelectric plants sold or acquired by eminent domain has not been limited to original cost, or such cost less depreciation. Under capitalized income no figures of value were introduced either. There was evidence that this approach is not helpful because sale of a noncompetitive

product whose price is regulated is involved. Furthermore because Moore is part of a larger unit it is difficult to segregate its share of the income. Finally both experts presented figures of value based on the cost of an alternate source of power, a pumped storage plant. They were as follows: 1969, Company $19,926,447, Town $33,248,000; 1970, Company $21,613,075, Town $36,843,000; 1971, Company $24,025,112, Town $38,710,000.

All of the above approaches to valuation are recognized as valid. *Public Service Co. v. New Hampton,* 101 N.H. 142, 136 A.2d 591 (1957). Evidence thereunder, with the resulting values arrived at by those approaches which were deemed relevant, was properly admitted in evidence. There is no rigid formula which can be used to arrive at full and true value of Moore for ad valorem tax assessment. *See New England Tel. & Tel. Co. v. State,* 113 N.H. 92, 95, 302 A.2d 814, 817 (1973). Nor is specific weight required to be allocated to any of the several approaches. *Kittery Electric Light Co. v. Assessors of Town,* 219 A.2d 728, 737 (Me. 1966). Judgment is the touchstone. If the master has considered and assigned such weight to each value indicator as appears to be fair, just, and equitable according to the evidence presented, this court will not disturb his conclusions on appeal absent errors of law. *Public Service Co. v. New Hampton,* 101 N.H. 142, 136 A.2d 591 (1957); *Trustees & c. Academy v. Exeter,* 92 N.H. 473, 486, 33 A.2d 665, 673 (1943); 20 U.C.L.A. L. Rev. 419, 432 (1973); *see Sheris v. Morton,* 111 N.H. 66, 69, 276 A.2d 813, 816 (1971); *Concord Natural Gas v. Concord,* 114 N.H. 54, 314 A.2d 679 (1974). The burden was on the company to satisfy the master by a preponderance of the evidence that it was paying more than its proportionate share of the taxes in Littleton and thus entitled to an abatement. *Edes v. Boardman,* 58 N.H. 580, 584 (1879); *Duval v. Manchester,* 111 N.H. 375, 376, 286 A.2d 612, 613 (1971); *County of Pima v. Trico Elec. Cooperative,* 15 Ariz. App. 517, 519, 489 P.2d 1219, 1221 (1971). The master recognized this company burden of proof in his report.

Turning to reproduction cost, one of the three approaches to value by which opinions of the value of Moore were presented, the master recognized in his report that "the original

cost of Moore is substantially less than its reproduction cost." Furthermore he enumerated Moore's many advantages over other types of plants, that is, low operation and maintenance costs, adaptability to automation, quick starting, ability to make rapid changes in output, and lack of need of anti-pollution devices. However, the master pointed out, based on evidence presented, that Moore would not be built today if it did not already exist. "This is due largely to the advent of nuclear power, the trend to larger generating stations, development of pumped hydro, and high comparative cost of constructing conventional hydroelectric facilities." The company's expert witness testifies that "the problem [with reproduction cost] is not so much the validity of the technique . . . as the fact that the answers come out just beyond all reasonable relationship to the value of the project that any pertinent utility would pay." The town's expert witness admitted that the reproduction cost analysis could be dismissed from discussion because "nobody would pay that much money." Contrary to the town's contention, we hold that the master considered reproduction cost less depreciation as an approach to value and properly concluded that it was "not relevant" in this case. *Northern Natural Gas Co. v. Dwyer,* 208 Kan. 337, 356, 492 P.2d 147, 162 (1971); *see Fusegni v. Portsmouth Housing Auth.,* 114 N.H. 207, 317 A.2d 580 (1974); *Moulton v. Groveton Papers Co.,* 114 N.H. 505, 323 A.2d 906 (1974); 1 J. Bonbright, Valuation of Property 164 (1937).

The master devoted a large share of his report, and a detailed appendix, to the alternative source of power approach to value. He noted that this method has been recognized as proper by this court. *Public Service Co. v. New Hampton,* 101 N.H. 142, 147, 136 A.2d 591, 596 (1957). The basis of this approach is that a prospective purchaser would not pay more for Moore than what it would have to invest in another plant to obtain the same amount of power and energy for the same purpose as that supplied by Moore. The procedure is essentially the following. A choice is made of the type of plant which would be the cheapest alternate source of the required power and energy. The plant's cost is determined in terms of cost per kilowatt which is annualized. Its annual operating costs are determined from which the costs

of operating Moore are deducted. By the use of appropriate capitalization factors a break-even investment for Moore is arrived at. This is some evidence of the market value of Moore because at that figure it makes no difference to the prospective purchaser whether he is going to have Moore or the alternate.

The master found that the evidence relating to this method of valuation was relevant but "conflicting and confused". "Although the experts produced itemized charts, formulas and statistics to back up their testimony which appear plausible enough, they can lead one to widely varying results." Using a schedule submitted by the expert witness for the town as a format, the master analyzed each item in the formulas used in the computations of the parties, and in an appendix to his report indicated his computations based on his conclusions on the proper factors to be used, after an analysis of the evidence presented.

The master pointed out that the company contends that the generating power of Moore is 190,000 KW while the town claims it is 200,000. The company claims the cost per KW for 1969 is $85 and the town contends it should be $103.77. As the latter costs are multiplied by either 190,000 or 200,000 KW it is evident that there would result a substantial difference in the assumed cost of the alternate source plant for 1969 depending on which is used (Company $16,150,000, Town $20,754,000). "Certainly a prospective purchaser in considering the cost of an alternate would not necessarily take the highest figure for comparison, nor should we assume that he would take the lowest." The master found that a reasonable estimate and one a prospective purchaser would likely use would be $100 per KW in 1969, $105 in 1970 and $110.25 in 1971. Under this finding the plant cost for 1969 would be $20,000,000.

The company expert used a cost of money to build the plant of 9.37% in 1969, the town 6.87%. The master recognized that a difference in cost of money would result depending on whether the historical or embedded cost was used or the incremental cost or new money. The difference in the proportion of debt, preferred stock and equity in the financing would also affect its cost. The master concluded

that 7.75% for 1969 was a proper assumption of the probable cost of money. The percentage of assumed fixed charges to total investment is also an important factor in the result reached. The company assumed it to be 13.2304% for 1969 and the town 12.509%. The master on the evidence arrived at an annual fixed charge of 13.389% of total investment for that year.

The cost of purchasing off-peak electricity to pump the water to the higher reservoir is also a significant item. "Spencer [expert for the town] testified that he took fuel costs equal to 2.75 mills per KW in 1969, 5.50 mills in 1970, and 5.96 mills in 1971, which was the cost of fuel plus 1 mill. Schultz [expert for the company], on the other hand, took 4 mills in 1969, 4.2 mills in 1970, and 4.4 mills in 1971 .... Apparently Schultz assumed the use of nuclear power, which will undoubtedly become available sometime in the future, but was not available in 1969-71 inclusive ... For these reasons we believe that a prospective purchaser would not consider seriously nuclear fuel as a source of pumping power during the several years and would compute the cost as Mr. Spencer has done, which the master considers to be reasonable."

The master found one assumption made by Spencer very difficult to understand. It is the fact that he apparently assumed an alternate plant which, although it would have the same capacity as Moore, would run only two hours per day, five days a week at full load and would generate only 104,000,000 KW per year. To make up the difference to 251,000,000 KW produced by Moore Station it would be necessary to purchase an additional amount of on-peak energy. Schultz, on the other hand, assumed a pumped storage plant would deliver the same amount per year as Moore does. The master found it "is reasonable to assume that the hypothetical plant should produce 251,000,000 KW per year but if it could produce only 104,000,000 KW with off-peak power for pumping, then one must conclude that it is not comparable as an alternative, and the cost becomes meaningless." The master's computations based on his findings on the figures of both parties and following the format of the town arrived at a break

even investment of Moore of $26,925,087 for 1969. The company figure was $20,237,745 and the town $36,726,000.

The master also found that "it is not possible to adopt the theory of either witness in toto, nor is it possible to test the figures. The theory developed by each being based on a prediction as to the future can be considered only as one factor which a willing purchaser would consider before deciding how much he would pay for Moore Station." He found further that "because of the uncertainty of determining the value [of Moore] based on an alternate pumped storage facility, and the many variable factors involved, [an interested purchaser] would consider original cost less depreciation." The company evidence on "net investment" or original cost less depreciation, for the year 1969, fixed it at $24,090,896, and the town $24,085,478 which amounts vary very little from the company's rate base figure of $24,079,959. This court held in *Public Service Co. v. New Hampton*, 101 N.H. 142, 136 A.2d 591 (1957), that the market value of a public utility for property tax purposes is not limited to the value placed on it for rate-making purposes. This does not mean, however, that in an individual case the trier of facts may not, after considering all factors, conclude that original cost less depreciation most closely approximates market value. *Independent School Dist. No. 99 v. Commissioner of Taxation*, 211 N.W.2d 886, 891 (Minn. 1973); *Kittery Elec. Light Co. v. Assessors of Town*, 219 A.2d 728, 735 (Me. 1966). The master found that this approach "may have an influence on what one would pay" for Moore.

The master further found that in considering this approach "it is necessary to consider the effect of the Federal Power Act and of its license provisions." This very issue was raised in this court in the appeal of *Public Service Co. v. New Hampton supra*. It was not considered, however, because it had not been brought up in the lower court. This same issue was considered recently, however, in *Town of Barnet v. New England Power Company*, 130 Vt. 407, 413, 296 A.2d 228, 232 (1972), which involved the fair market value for property tax assessment of company property, which is a part of project No. 2077 involved in this case, but not Moore itself. In accord with *New Hampton*, that court held that the assessing

authorities erred in concluding as a matter of law that the restrictions on the license imposed under the Federal Power Act limited the market value of the company property to its net book value. However, the court recognized that the restrictions can limit the fair market value of the property and "it is clear they are but one factor which must be considered" in its appraisal to arrive at market value for property tax purposes.

Some of the provisions of the license which might influence the market value of Moore are the following. The license to operate the project is for 50-years duration, in this case 1951 to 2001. 16 U.S.C. § 799 (1970). The United States, on two years notice in writing, has the right upon the expiration of the license to take over the project on payment of the "net investment" in it (16 U.S.C. § 807) which is "the actual original cost" less depreciation and other adjustments. 16 U.S.C. § 796 (13); *Niagara Falls Power Co. v. Federal Power Comm'n*, 137 F.2d 787 (2d Cir. 1943); *see Alabama Power Co. v. Federal Power Comm'n*, 482 F.2d 1208 (5th Cir. 1973). Rates set under the Act must be based upon the net investment in the project. 16 U.S.C. § 824, 824a, 824b; *Federal Power Comm'n v. So. Cal. Edison Co.*, 376 U.S. 205 (1964). Any surplus earned above a specified reasonable rate of return on the net investment after the first 20 years of operations is required to be held in an amortization reserve. 16 U.S.C. § 803d.

The master found that "[a]lthough four licenses have expired since 1970, no action has been taken by the government to acquire any of the properties, which does not necessarily indicate that in the year 2001 the government would not acquire the Moore property. There is no doubt that this would always be a consideration in the acquisition of any property." The master also found that although a prospective purchaser of Moore might want to pay more than net investment, the fact that the excess would presumably be carried in a separate account over the remaining life of the license could also affect the market value. On the other hand, the master found that other provisions of the license, such as certain restrictions on use in times of flood and a requirement that adjoining land be used for public recreation, would not diminish the value of Moore.

The town's expert witness in describing the methods he used in approaching the valuation of Moore testified: "Normally the first element that I inquire about is the original cost of the project." He also answered in cross-examination that the federal licensing of Moore and the restrictions hereinbefore described would be significant factors in what a buyer would pay for Moore. The company's expert witness also testified that the fact that Moore was federally licensed would be considered by a prospective buyer and would influence it in forming an opinion as to what price to offer for Moore. This court has recognized the fact that original cost can be considered in determining the present value of a utility or other property. See *Grafton & c. Co. v. State,* 78 N.H. 330, 335, 100 A. 668, 670 (1917); *Trustees & c. Academy v. Exeter,* 92 N.H. 473, 486, 33 A.2d 665, 673 (1943). The effect of restrictions on one's property has also been accepted as a factor to be considered in arriving at value for property tax assessment. See *Gowen v. Swain,* 90 N.H. 383, 387, 10 A. 2d 249, 252 (1939). The master found on the evidence in this case that an interested purchaser would consider original cost less depreciation. The master found that the fair or market value of Moore is at least equal to original cost less depreciation for the years 1969-71, being $24,008,923 for 1969.

The master then considered "whether or not there are to be any adjustments by way of additional amounts to be added to the original cost less depreciation for those years. As the nonproject land was stipulated to have a value of $43,760 and was carried at $10,940 an increase of $32,820 was made. Finding that land values in Littleton had increased substantially above the average cost of $115.85 per acre at which it was carried by the company, the master made an adjustment in the value of $196,199 for the year 1969 which was increased approximately 10% for the other years. The master also found added value of 5% above cost less depreciation in Moore's reserve capacity beyond that of a comparable pumped storage plant. This amounted to $1,200,446 for 1969. The master also found headwater benefits, upstream by virtue of the two Connecticut Lakes and Lake Francis, and downstream by holding back water to the benefit of the

users there situated. An added value of $334,000 to that part of Moore in Littleton was attributed by the master for these benefits in each year. Accordingly the master found that the true value of the plaintiff's properties in Littleton as of April 1, 1969, was $25,772,388., as of April 1, 1970, $25,570,242., and as of April 1, 1971, $25,610,908. The master then ruled that the company was entitled to an abatement of the difference between those values and the assessed values for those years.

The town without waiving any exceptions to the master's report moved that it be returned to him for corrections. The motion maintains that in his consideration of the value of Moore by the alternate source analysis the master made many incorrect assumptions or erred in his conclusions. We have examined the evidence and find that his conclusions by this method contained in his report and an appendix thereto are supported by the evidence. No purpose would be served in making a point-by-point analysis of the town's contentions as most of them have been covered already. However, the allegation that the master erred in his calculation of the cost of off-peak energy requires specific consideration.

Spencer, the town's expert witness testified that the cost of such energy was equal to 2.75 mills, 5.50 mills, and 5.96 mills plus 1 mill production expense and used this calculation in an exhibit introduced in evidence. The master acknowledged this in his report wherein he also stated that he was following Spencer's exhibit "as a format for arriving at ... valuation" under this method. The master also stated that instead of assuming the use of nuclear energy, as did the company, he would compute the cost of off-peak energy "as Mr. Spencer has done [cost of fossil fuel] which the master considers to be reasonable." The master denied, however, the town's request for a finding that: "The cost of fuel for Company used in the determination of the fair market value of Moore Project was as shown in Defendant's Exhibit U", which was the source of the fuel costs used by Spencer. The company argues that this indicates that the master adopted the town's method of computing the cost of off-peak energy but not the precise figures used by Spencer.

The town argues that if its contention is correct it would increase by $2,771,000 the value of Moore under this approach over what the master found it to be. However there would still remain a difference of many millions of dollars in the various values arrived at under this method. This tends to corroborate the master's conclusion that because the different factors in the formula are multiplied many times thus producing varying results according to the assumptions made, an interested purchaser, because of the uncertainty of determining the value based on an alternate pumped storage facility, and the variable factors involved would consider original cost less depreciation. Assuming for the purpose of argument that the town's contention is correct, on the record as a whole we cannot say that the alleged error affected the final result to its prejudice.

The town's other contention which needs to be considered is that the master erred in denying its request that in establishing the value of Moore based on the alternate plant method additional value must be attributed to Moore because it is presently existing while the other facility would be three to five years in construction. There was evidence that utility plant purchases are made on a forecast of need three or more years in advance, and that the time lag in obtaining a transfer of Moore's license would be comparable to the lag in constructing the alternate plant. The master could properly conclude that no going concern value should be attributed to Moore.

The full and true value of the company's property as defined in RSA 75:1 for the years involved was a question of fact to be determined by the master on the evidence presented. *Trustees & c. Academy v. Exeter,* 92 N.H. 473, 486, 33 A.2d 665, 673 (1943). Conflicts in the evidence were to be resolved by the master, who could accept or reject such portions of the evidence presented as he found proper, including that of the expert witnesses. *Wilson v. LeGrice,* 113 N.H. 485, 309 A.2d 646 (1973); *New Eng. Tel. & Tel. Co. v. State,* 104 N.H. 229, 236, 183 A.2d 237, 243 (1962). The approaches to value introduced in evidence were proper. *Public Service Co. v. New Hampton,* 101 N.H. 142, 136 A.2d 591 (1957). The master was not required to accept any par-

ticular approach. *See New England Tel. & Tel. Co. v. State,* 113 N.H. 92, 95, 302 A.2d 814, 817 (1973). His report indicates that he considered all of the methods presented and particularly those which the parties found most relevant to the Moore property. *See Northern Natural Gas Co. v. Dwyer,* 208 Kan. 337, 492 P.2d 147 (1971). We hold after a review of all the testimony presented as well as of the exhibits that on the record the master could properly conclude that the true values of Moore for ad valorem property tax assessment in the town of Littleton for the years 1969-1971 were as he found them to be in his report.

*Exceptions overruled.*

All concurred.