Belknap,
No. 4567.

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE *v.* NEW HAMPTON.

Argued June 4, 1957.

Decided November 26, 1957.

*Sulloway, Hollis, Godfrey & Soden (Mr. Hollis orally)*, for the plaintiff.

*Upton, Sanders & Upton (Mr. Richard F. Upton orally)*, for the defendant.

BLANDIN, J.   The plaintiff's position in broad outline is, first, there was "no competent evidence to support a finding of a market value of the Ayers Island plant . . . in excess of its net book cost," and, second, "That the Trial Court, in reaching its decision applied incorrect principles of law, made findings and rulings contrary to and unsupported by the evidence, and otherwise erred . . . . "

At the outset it must be said that unusual problems are inherent in utility cases such as this.   An obstacle to a rational and plain exposition is that due to factors hereinafter discussed, truly satisfactory standards for testing value do not exist.   Again, in rate

base disputes the interest of the utility is to show the value of its property at the maximum while that of the ratepayers is to establish the lowest possible value. In tax cases the situation is exactly reversed. It is the public, represented by the assessors, which seeks to include the last dollar of worth in the assessment, while the company is avidly eager to have the value of its property considered in the most modest light. Generally there are readily available to both parties experts, the disparity of whose estimates increases the difficulty of reaching a fair conclusion.

On the question of value in the present case the plaintiff's evidence was that the property is electric utility property, having its highest value as such, that it is subject to regulation by the Public Utilities Commission of the State, and in the past its rate base and that of similar utilities has been based on net book cost, or original cost less depreciation. From this the plaintiff argues that the tax value of its plant cannot exceed its rate base or net book cost, both as a matter of law and fact.

The defendant disagrees with this conclusion and produced evidence on valuation consisting of reproduction cost figures less depreciation, a figure based on the cost of an equivalent steam-generating capacity, and a valuation based on the capitalized earning power of the Ayers Island plant. The Court, in its findings and rulings, stated that in reaching its conclusion it considered the rate base, the original cost less depreciation, the factor of regulation, the dependable capacity of the plant at low water, the value of this capacity "based on the annual cost of alternative steam power capacity," the return upon investment, and the cost of construction of a new plant. It ruled that "fair market value for purposes of taxation involves valuation in a free market," and having weighed all the above factors, made a finding that the market value of the plaintiff's taxable property in New Hampton was $2,400,000 which, multiplied by the agreed figure of fifty-one per cent, that being the proportion of full value at which other property in New Hampton was assessed, would justify an assessment of $1,224,000. The actual assessment being $1,218,899, the Court dismissed the petition.

To resolve the dispute as to whether there was competent evidence to support the verdict it is necessary first to examine the applicable law. RSA 75:1 lays down the rule for appraisal of taxable property as follows: "The selectmen shall appraise all taxable property at its full and true value in money as they would appraise the same

in payment of a just debt due from a solvent debtor, and shall receive and consider all evidence that may be submitted to them relative to the value of property the value of which cannot be determined by personal examination." In construing this statute in *Winnipiseogee &c. Company* v. *Gilford*, 67 N. H. 514, 517, our court said, " 'The selectmen shall appraise all taxable property at its full and true value in money, as they would appraise the same in payment of a just debt due from a solvent debtor' (P. S., c. 58, s. 1), that is 'at its just value.' P. S., c. 233, s. 1. Such value is the market value, or the price which the property will bring in a fair market, after reasonable efforts have been made to find the purchaser who will give the highest price for it." See also, *Trustees &c. Academy* v. *Exeter*, 92 N. H. 473, 481. The principle laid down here has never been questioned in this state and is recognized elsewhere. *Olson* v. *United States*, 292 U. S. 246.

The establishment of market value as a test for taxation purposes presupposes a market. In instances such as this where only a part of an integrated system is involved, the difficulty, if not the impossibility of finding an actual customer, especially where, as here, the owner has a lawful monopoly in the surrounding area, is obvious. *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549; see *Stevens* v. *Fellows*, 70 N. H. 148, 150. Yet it is plain that to hold there is no market value in such instances would mean that valuable property would entirely escape its just share of the burden of taxation. Such a policy would make neither good law nor good sense. Courts recognizing this have acted accordingly and have considered all factors calculated to influence an assumed buyer and seller in a free market. *Atlantic &c. Railroad Co.* v. *State*, 60 N. H. 133, 140; *Turnley* v. *Elizabeth*, 76 N. J. L. 42. In so considering, it must, as previously stated, be remembered that the property is and may be used as an integral part of an entire system and that its value may be enhanced for this very reason. *Winnipiseogee &c. Company* v. *Gilford*, 64 N. H. 337. In all the circumstances here it is obvious that ordinary standards may not furnish an adequate guide to determine value. *Boston Gas Co.* v. *Assessors of Boston, supra,* 580, 581.

Since indisputably the property has its greatest value as an electric public utility the purchaser may be assumed to be such. The plaintiff excepted to the granting of requests that it could be considered as a potential customer. However, it appears under the law that the price an electric utility, including the plaintiff itself

or a buyer in its position, would pay to an assumed third person may be considered. *Arlington Mills* v. *Salem,* 83 N. H. 148. See also, *Boston Gas Co.* v. *Assessors of Boston, supra,* 581, where the court sanctioned evidence of the value for a sale and lease back to the present owner and others in its class. The evidence of the worth of the property to an electric public utility purchaser including the plaintiff was properly received, and the plaintiff's exceptions are overruled.

The plaintiff claims that evidence of reproduction cost was incompetent. The authorities, and the better reason, it seems to us, are to the contrary. *Chicopee Mfg. Co.* v. *Company,* 98 N. H. 5, 8; *Boston Gas Co.* v. *Assessors of Boston, supra.* See also, *People ex rel Lehigh Valley R. R. Co.* v. *Harris,* 168 Misc. N. Y. 685, affirmed 281 N. Y. 786. In the *Chicopee* case (*p.* 8), which was a rate case, our court held that while evidence of reproduction cost might be rejected, it could also be admitted as it might "under some circumstances" be a "helpful guide." See also, *Grafton &c. Co.* v. *State,* 78 N. H. 330; *Trustees &c. Academy* v. *Exeter,* 92 N. H. 473, 486; 104 A. L. R. 790, 795. As to the admissibility of reproduction cost evidence on the issue of market value, the *Grafton* case, contrary to the plaintiff's contention, has not been overruled.

So, too, we believe testimony as to the economic value of the plant based upon the cost of providing equivalent steam-generated capacity was properly admitted. If one is contemplating buying an article, the cost of purchasing it as against building a new one is a natural consideration affecting the price. *Grafton &c. Co.* v. *State,* 78 N. H. 330, 335. The authorities support the competency of such evidence. *Company* v. *Gilford,* 67 N. H. 514, 517; *Boston Gas Co.* v. *Assessors of Boston, supra,* 584. The plaintiff's objection to this evidence was based upon the proposition that it indicates only the worth to the owner and as such is incompetent. *Trustees &c. Academy* v. *Exeter, supra,* 473; *Sisters of Mercy* v. *Hooksett,* 93 N. H. 301. However, the principle established in the *Exeter* case and approved in the *Hooksett* opinion is that although worth to the owner alone which could not be transferred to a purchaser may not be considered, transmissible value is material. *Trustees &c. Academy* v. *Exeter, supra,* 486. In the present instance, the Court weighed with other factors the worth to the owner which could be transferred to others. Since, as previously pointed out, the owner may be considered a hypothetical buyer, it is apparent the price he would have to pay for building a new

equivalent plant would influence his judgment in the purchase of this one. Furthermore, the defendant's expert testified he did not base his calculations solely on value to the owner but also on his knowledge of costs generally. He considered the "cost of moderately-sized fuel plants of recent design in the northeastern part of the United States," and tested the figures of the plaintiff against other companies. Applying this method of valuation which he testified without contradiction was "one of the most common methods" of evaluating a hydroelectric plant, and which indeed the plaintiff's evidence to a degree confirmed, the witness, assuming "a dependable capacity" of 7,000 kilowatts, at times of lowest stream flow, operating on a peak of 7½ hours duration, which the Court found to be the plant's most valuable potential use, arrived at a valuation of the property of $3,133,900.

The plaintiff also objects because the defendant's expert failed to take into account depreciation in this connection. It must be remembered that the Court's valuation for tax purposes was well under the findable valuation based on the testimony of the expert. When it is considered, among other factors, that the life of the Ayers Island dam was fixed by the plaintiff itself at one hundred and fifty years, it would appear that in reaching its final conclusion the Court, as stated in its findings, made substantial allowance for such depreciation.

The defendant also relied upon a valuation based upon evidence as to the earning power of the Ayers Island plant. That such a factor is an element to be considered, though not necessarily controlling, in assessing tax values is well established. *Atlantic &c. Railroad* v. *State*, 60 N. H. 133; *Trustees &c. Academy* v. *Exeter*, 92 N. H. 473; *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 584. The fact that there may have been discrepancies in the testimony of the defendant's expert and that his method of evaluation was not approved by the plaintiff, although it produced no expert to refute it, went to the weight of the evidence, but not its admissibility. *State* v. *Company*, 91 N. H. 278, 291. The calculations of this expert show that the value of the plant based on its earning power amounts to $3,336,644. This result was reached by capitalizing at 5.65% the net return on the investment, computed by the witness to be $188,511. Thus, accepting this testimony as the Court could if it wished, the actual earnings show a value for the hydroelectric plant well above that claimed by the defendant. Furthermore, the resulting capitalized value would be

about $80,000 more if depreciation were taken on depreciable plant *only*, instead of on the whole plant including land and rights, as was done for the sake of simplicity.

It is argued that this computation is fallacious, because a hydro-electric plant could not earn this much unless backed up by an adequate steam plant. However, each type of generation is dependent on the other, and each has its period of lesser dependability when the other assists it. In the spring the hydroelectric plants carry the base load while the steam plants carry the peaks, the steam plants utilizing this period to be successively taken out of service for their annual 30-day overhauls. In the fall the steam plants carry the base load, while, due to lower water, the hydro-electric plants carry the peaks. Thus each source complements the other, and each needs the other. It could also be found that in a balanced, integrated utility system, assuming average water conditions, an efficient hydroelectric plant is a higher-than-average earner. This is due among other reasons to the fact that it consumes no fuel and that it could be found that this particular plant had better than average water conditions which enhance its value.

The defendant argued that under the law applied to the findings of fact the Court's decision that the taxable value of the plaintiff's property was $2,400,000 was supported by competent evidence and was well within the bounds of reason. However, the plaintiff attacks this conclusion vigorously, partly on the basis that the fair market value *cannot* exceed the net book cost of $1,102,908, since the company's net earning power as regulated by the commission is based upon this figure and the plaintiff asserts that no one would pay more for the property than the amount on which he would be able to earn a return. There is force in this argument and to determine its ultimate validity it is necessary to further examine certain decisive factors.

At the outset it is conceded by the plaintiff and established by the authorities that the value of the plant for tax purposes and the value for rate-making purposes need not be the same. *Trustees &c. Academy* v. *Exeter*, 92 N. H. 473, 487; 1 Bonbright, Valuation of Property, 515, 516. However, the company attempts to avoid the consequences of this principle by arguing that in this state "earnings are limited to a particular type of rate base," so that the rate base value marks the ceiling of the fair market value as fixed by the commission and hence limits the tax value of its plant. The

Court ruled, however, that under the laws governing the transfers of utility property the commission might not lawfully disapprove the sale of the property "at a fair and reasonable price, even though that price exceeds net book cost."

The applicable statute (RSA 374:30) so far as material provides that "Any public utility may transfer . . . its franchise, works or system, or any part of such . . . when the commission shall find that it will be for the public good . . . ." The plaintiff agrees that the Public Utilities Commission is not bound as a matter of law to disapprove a sale at a price in excess of net book cost but says that our court would sustain it if it did so. It further asserts the Court's ruling is erroneous on other grounds. One is that the *Grafton* case (78 N. H. 330, 334), which supports the Court's conclusion, has been overruled. We do not find that this case as applied to the transfer of utility assets has ever been overruled. The conclusion that the seller of property is entitled to a fair and reasonable price, whether a utility or a private individual, is still the law here. See also, *Grafton &c. Co.* v. *State,* 77 N. H. 490. Although through its power over the issuance of securities the commission may indirectly control the selling price, it cannot reduce it below a fair valuation. *Grafton &c. Co.* v. *State,* 78 N. H. 330. Since this is so, the transfer price is entitled to consideration in fixing a reasonable and fair return.

That the commission recognizes this is shown by its system of uniform classification of accounts for electric utilities which became effective January 1, 1935, and so far as material here remains unchanged. In adopting this new system the commission referred to the *Grafton* case (77 N. H. 490, 497), and recognized that the transfer price might exceed net book cost. *Uniform Classification of Accounts for Electric Utilities,* 16 N. H. P. U. C. 282, 291, 292. To cover this situation a separate account No. 304, "Fixed Capital Adjustment" was set up, the purpose of which was therein stated to be as follows: "This account shall be debited (or credited) with the amount, if any, by which the price paid, under authority granted by . . . this Commission, for operating property acquired since January 1, 1935, from a predecessor public utility differs from the book value thereof." When the plaintiff came under this account some years later (22 N. H. P. U. C. 124) it recorded nearly $1,000,000 in Account No. 304 representing the difference between prices *paid* by it for utility property and the *net book cost* of this property when first devoted to public use. It appears that this

item has ordinarily been allowed in establishing the rate base of a utility. The record therefore supports the ruling of the Court that a sale at a fair price even though it exceeded net book cost would be permitted if "for the public good" (RSA 374:30) and rates of the utility fixed accordingly. Although no cases in this jurisdiction covering this point have been brought to our attention, other jurisdictions seem in accord with this view. *Edison Company* v. *Maltbie,* 271 N. Y. 103; *A. T. & T. Co.* v. *United States,* 299 U. S. 232.

In connection with the plaintiff's insistence that net book cost and the value for tax purposes must be the same, it seems that, among other considerations, changing price levels would render such a method impractical and unfair. The inequities of holding rigidly to the formula of net book cost for tax purposes can well be illustrated by assuming two approximately equivalent plants in the same town, the first built in an era of high costs, such as the present, and the second built in a low-cost era such as we encountered in the '30s and may well experience in the future. Applying the net book cost theory in the event of construction during depressed prices, the town would be entitled to a higher tax value on the older plant than on the newer one, though the latter was performing the same function, was equally well constructed, and contained newer and less worn equipment. Also, the valuation for rate base purposes represents the composite value of the utility system as a whole with some high cost and some low cost, some efficient, some less efficient, plants. An individual plant such as the one at New Hampton might have more intrinsic or market value than another in the system but this is not necessarily reflected in its rate base value because of the date of acquisition or the circumstances under which it was acquired. The selectmen could properly take this into account in making their assessment. It is obvious, too, that anyone would pay more than rate base value for a needed plant if current reproduction cost made it a good buy, and the selectmen were entitled to consider this.

A further reason why taxation value should not be fixed at net book cost is because a regulatory body such as the Public Utilities Commission should have no difficulty in accommodating itself to the valuation principles of the taxing authority. Since property taxes are a proper operating expense, any erosion of the return of the utility may be compensated for by an increase in rate. The taxing authority, on the other hand, is not free to adjust the rate

of taxation in order to bring about equitable results among taxable properties.

The plaintiff's claim, advanced for the first time in a supplementary brief, that the Federal Power Act affects the present case does not require extended consideration. The record does not show that the market value of the plaintiff's property is affected by the federal act. This issue was not raised in the lower court, and it is too well settled to require citation that it now comes too late.

What we have said disposes of the plaintiff's exceptions both to the denial of many of its requests and to the granting of numerous requests of the defendant. It appears, however, that certain specific exceptions covering some phases of the case require particular treatment. Plaintiff's request No. 10 reads as follows: "Since 1926 electric utility property in New Hampshire has consistently been bought and sold on the basis of net book cost, irrespective of the nature of such property." Upon this the Court ruled, subject to exception, that "If so, it is immaterial on the question of fair market value." When evidence of other sales since 1926 was introduced the defendant objected on the ground that reasonable similarity of conditions to the present case had not been shown as required by *Eames* v. *Corporation*, 85 N. H. 379. Nevertheless, the Court received the evidence. However, it was findable on the record that many of these sales · were between affiliates or parent and subsidiary companies and were not actual arms-length transactions. See *A. T. & T. Co.* v. *United States*, 299 U. S. 232, 239. Others involved small companies in a weakened condition which were gradually being surrounded by the plaintiff company, and the plaintiff being virtually the only customer could, in effect, set its own price. Many of the sales, too, occurred before World War II inflation had become operative and while costs were relatively stable. In no instance did the plaintiff introduce evidence that these properties would have produced a price higher than net book cost under any circumstances. It may be noted that testimony as to the one sale of a plant of substantial size concerned the plaintiff's installation known as Jacona. This was sold to the United States government for some $400,000 more than the net book cost. In short, it is fair to assume that after receiving the disputed evidence the Court concluded that the test as established by the *Eames* case had not been met and therefore the fact these properties had been bought and sold on a basis of net book cost was not material in fixing the market value of the

New Hampton property. The words in the request "irrespective of the nature of such property" add nothing here since it was findable that no evidence of sales of similar property actually was introduced. In these circumstances, since all presumptions are in favor of the validity of the Trial Court's ruling (*Hall* v. *Insurance Co.*, 91 N. H. 6, 14), it is sustainable and the plaintiff's exception is overruled.

During the trial the plaintiff sought unsuccessfully to introduce a master's report taken at a prior hearing involving other property it owned in the city of Franklin. It appears the character of the property differed from that presently involved, the report was never acted upon by the Court and the numerous exceptions taken were not decided as the case finally resulted in a compromise settlement. It is fundamental that the report of one tribunal in such a situation as this is incompetent to influence the opinion of another (*Edgcomb Steel Co.* v. *State*, 100 N. H. 480, 486; 14 Am. Jur., Courts, *s.* 80), and no error appears in the Court's ruling.

Exception was also taken to the Court's finding that the hypothetical buyer or seller need not be a public utility. Since it is undisputed that the highest value of the plant on a free market is as a public utility, it is difficult to see how this finding could have harmed the plaintiff. There was evidence of a purchase by the plaintiff from a non-utility company of certain property. There was also evidence of the sale of Jacona by the plaintiff to a government agency. The inclusion of non-utilities in a hypothetical market could not have made the value higher since the Court found that the highest value was on the utility market and it therefore appears that the Court's error, if any, was harmless. See *Reed* v. *Linscott*, 87 N. H. 139, 142. See also, *Groulx* v. *Groulx*, 98 N. H. 481.

The plaintiff excepted to the granting of defendant's request No. 39 which, in effect, permitted the Court to consider expert evidence of reproduction costs less depreciation as bearing on market value, without this testimony being subsequently evaluated by an expert witness. No authority is cited for the novel proposition that expert testimony once introduced must be subject to the additional refinement of having the same or another expert tell the Court how to evaluate it. We believe the Court was capable of comprehending the significance of this evidence without further elaboration. *Trustees &c. Academy* v. *Exeter*, 92 N. H. 473. See also, anno., 104 A. L. R. 790, 795. The plaintiff's exception is overruled.

In summary, it appears to us that it may be justly said of the conclusions of the selectmen of the defendant town, as of "many honest and sensible judgments" that "they express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth. The Board was created for the purpose of using its judgment and its knowledge." *Holmes*, J. in *Chicago, B. & Q. Ry. Co.* v. *Babcock*, 204 U. S. 585, 598. We believe here that the board of selectmen did use its knowledge and judgment and that the result reached was within the bounds of reason. The record discloses that the Superior Court committed no errors of law or fact prejudicial to the plaintiff. It follows the order is

*Petition dismissed.*

All concurred.