Rockingham
No. 83-268

CITY OF MANCHESTER

v.

TOWN OF AUBURN

July 2, 1984

148

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Arthur G. Greene & a.* on the brief, and *Mr. Greene* orally), for the plaintiff.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Eugene M. Van Loan, III, & a.* on the brief, and *Mr. Van Loan* orally), for the defendant.

BATCHELDER, J. This is an appeal from a decision of the superior court granting the Manchester Water Works, a subdivision of the plaintiff, the City of Manchester (city), a tax abatement. *See* RSA 72:11 (Supp. 1983); RSA 75:15 (Supp. 1983). The city had petitioned for an abatement of assessments made pursuant to RSA 72:11 (Supp. 1983) by the defendant, the Town of Auburn (town), for the

years 1980–82 inclusive on the Water Works' property in the town. In a lengthy report, the Master (*R. Peter Shapiro*, Esq.) valued the Water Works' property and recommended that its payments be abated. The Superior Court (*Bean*, J.) approved the report and issued an order in accordance therewith. We affirm.

The Water Works owns and operates a drinking-water treatment facility in the city on the westerly shore of Lake Massabesic. The city has utilized the lake as a source of its water supply for more than one hundred years. Over time, the city has purchased substantial acreage within the watershed of Lake Massabesic to protect the integrity of its water supply.

In the watershed, the city owns approximately 3,847 acres located in the town. Of this land, one parcel consisting of approximately 1,364 acres borders the lake. Other parcels are located in the immediate vicinity of the lake. The surface of the lake extends over some 2,512 acres, most of which lies within the town.

The master found that the city had restricted the use of the lake to fishing and boating, allowing no swimming, water skiing or similar activities. He described the shoreline as being predominantly rocky but with occasional wooded areas, sandy beaches, marshes, and areas that front public highways.

As part of its revaluation of the town in 1979, the New Hampshire Department of Revenue Administration (department) conducted an appraisal of the market value of all the property in the town, including the city's property. On the basis of the department's valuation of the Water Works' property at $18,094,800, the defendant billed the city pursuant to RSA 72:11 (Supp. 1983) for payments in lieu of taxes. Based upon a tax rate of $14.70 per thousand and an equalization ratio of 93.5 percent, the bill for 1980 was for $265,993.56.

The Water Works made its 1980 payment under protest and filed a petition to abate in the superior court. A second petition was later filed, directed at the 1981 levy. During the course of trial on these petitions, the parties agreed that the action would be treated as one for abatement of the 1982 payment as well, and that any finding of disproportionality for 1980 would also apply to 1981 and 1982. In addition, it was agreed that with respect to all three tax years at issue, an equalization ratio of 93.5 percent would apply to the master's valuation of the subject property.

By agreeing to this equalization ratio, the parties, in effect, agreed that, on average, all taxable property in the town of Auburn (other than the Water Works' property) had been assessed at 93.5 percent of its full and true value in money as of April 1, 1980. *See* RSA 75:1 (Supp. 1983); *Stevens v. City of Lebanon*, 122 N.H. 29, 32–33, 440 A.2d 451, 453–54 (1982). Since the equalization ratio and the

tax rates for the years in question were agreed upon, the only issue for the trial court to resolve was whether the valuation of the subject property by the town was in accordance with the dictates of RSA 72:11 (Supp. 1983).

RSA chapter 72 is captioned: "Persons and Property Liable to Taxation." The pertinent section relative to the taxation of water-works and flood control property held by one municipality within another municipality is RSA 72:11 (Supp. 1983), which provides:

> "*Water Works; Flood Control.* Property held by a city, town or district in another city or town for the purpose of a water supply or flood control, if yielding no rent, shall not be liable to taxation therein, but the city, town or district so holding it shall annually pay to the city or town in which such property lies an amount equal to that which such place would receive for taxes upon the average of the assessed value of such land, without buildings or other structures, for the 3 years last preceding legal process to acquire the same, or other acquisition thereof, the valuation for each year being reduced by all abatements thereon; but any part of such land or buildings from which any revenue in the nature of rent is received shall be subject to taxation; such payments shall be paid to the collector of taxes of the town or city in which such property lies upon notification from him, and such payment shall be made on or before December 1 in each year; *provided, however, that after such acquisition the valuation thus established shall be subject to change, as to make such value proportional with the assessed value of other property in the town which is subject to taxation, so that such payment will not exceed its proportion of the public charge in that year.* Any city or town aggrieved by the payment in lieu of taxes on such property shall have the same right of appeal as a taxpayer may have."

(Emphasis added.)

The evidence adduced at trial indicates that the town's assessment for 1980 was based on a so-called "multiplier method" of valuation, which method the town had urged upon the department as being consistent with the interpretation of RSA 72:11 (Supp. 1983) made by this court in *Manchester v. Auburn,* 102 N.H. 325, 156 A.2d 774 (1959). The department had initially appraised the subject property as having a fair market value in 1979 of $7,880,100. After receiving this appraisal, a selectman for the town asked the director of the department's property appraisal division to reconsider its appraisal.

Following discussions with the selectman and counsel for the town, the department reappraised the Water Works' property, using the "multiplier method," and arrived at the figure of $18,094,800.

The town argues that the use of the "multiplier method" is supported by RSA 72:11 (Supp. 1983) and our interpretation of that statute in *Manchester v. Auburn.* The town grounds its argument on the contention that the keystone to assessments of water supply property is *proportionality.* It then reasons that for the city's tax burden to remain proportional to that borne by other taxpayers, the valuation of the Water Works' property must directly reflect the ratio by which the assessed values of other taxable property have increased or decreased from year to year.

Following the department's appraisal of the town in 1979, the town observed that the fair market value of taxable land, excluding that of the Water Works, increased from $5,390,550 to $19,127,298 between 1978 and 1979, or by a factor of 3.548, while the Water Works' property appreciated from $5,100,650 to $7,880,100, or only by a factor of 1.544. Because it concluded that the initial appraisal resulted in a disproportionality in favor of the city, the town argued that its "multiplier method" of valuation would rectify this disproportionality.

The application of the "multiplier method" to the Water Works' property entailed taking the 1978 valuation of the subject property and multiplying it by 3.548, the factor by which all other taxable land in the town of Auburn had appreciated. The application of this formula ($5,100,650 x 3.548) produced $18,094,800, the valuation which, in turn, became the basis for the defendant's 1980 assessment of the property.

The town justifies the application of this "multiplier method" by pointing to the following language in *Manchester v. Auburn:*

"If following the acquisition of water supply properties by the plaintiff, the true or market values of taxable properties in the town increased, quite apart from any increment of value attributable to improvement of such property, and thereby produced increased tax assessments, the amended statute requires that *the original valuation of the water supply properties,* based on historical assessments presumably proportional to other assessments at that time, *shall be increased in proportion to any subsequent rise in assessed values of properties which remained taxable . . . .* [W]hen reference to increases in the true and market value of taxable property is made, increases due to inflation or to the devaluation of the dollar are meant,

and not increases resulting from development of the taxable property by new construction or the like."

*Id.* at 332, 156 A.2d at 781 (emphasis added).

According to the town, the court explained the statutory reference to "proportional" by use of the following example: "If assessments increased ten percent, then the valuations of water supply property shall be increased proportionally." *Id.* at 330, 156 A.2d at 779.

 We agree with the city that the town has read *Manchester v. Auburn* selectively. Although the concept of proportionality was foremost in the court's mind, the concept was, and should be, interpreted with reference to its historical use in tax assessment cases and not wrenched into some inflexible, "multiplier" formulation. *See, e.g., Ainsworth v. Claremont,* 106 N.H. 85, 88, 205 A.2d 356, 358 (1964) ("if each property is appraised at the same proportion to its full and true value, . . . the resulting taxes must be proportional"). For proportionality of tax burdens to be achieved, the properties being compared must be assessed and taxed according to the same criteria. We realized this in *Manchester v. Auburn,* and we said so:

"In order for the revaluation to be 'proportional with the assessed value of other property in the town' (RSA 72:11) which is required by RSA 75:1 to be appraised at 'full and true value,' *the revaluation of water supply property must likewise be at true value,* or in the same ratio thereto as assessed values, if the latter are not at true value."

*Manchester v. Auburn,* 102 N.H. at 333, 156 A.2d at 781; *see also id.* at 330, 156 A.2d at 779–80 ("the annual charge [called for by RSA 72:11] is to be determined on the basis of periodic valuations . . . to make the value proportional to assessments for taxation, *which involves use of the same general method employed in making assessments."* (Emphasis added.)).

██ ██ Accordingly, we hold that RSA 72:11 (Supp. 1983) does not require the use of a "multiplier method" of valuation; rather, it requires that water supply land be valued in accordance with the same principles as are used in assessing the full and true value of any other parcel of property. Furthermore, we hold that the master's reasoning in rejecting the "multiplier method," because of that method's inherent inadequacies, was sound. The master wrote:

"The fact that land, exclusive of buildings, and not owned by plaintiff increased in value from 1979 to 1980, by a factor of 3.548, may have some bearing on the increase in value of plaintiff's property from 1979 to 1980. This is cer-

tainly a factor the Master may consider in establishing the plaintiff's 'full and true value' of its property. Defendant's analysis presupposes that the cause of the increase in value is inflation which applies equally to all property. There may be many other factors which affect the value of property and cause it to increase or decrease. The location of roads, utilities, public amenities such as schools, parks, hospitals and libraries will increase the value of land. On the other hand, the location of industry, waste sites, and commercial areas could decrease land values. Government action such as zoning can affect the value of land. Also, as a community is developed, the demand and supply of land for specific uses changes. All of these factors must be considered as elements of the increase in value of land in Auburn from 1979 to 1980. As a practical matter, the Master considered the fact that there was an increase in land values in Auburn from 1979 to 1980. However, there were many other matters given greater weight in the final analysis of the 'full and true value' of plaintiff's land."

Accordingly, the master made no error of law when he rejected the town's contention that use of the "multiplier method" resulted in a valuation which was presumptively correct.

We turn to the question of the adequacy of the master's finding of the fair market value of the Water Works' property. The town raises several claims of error regarding the master's methodology and his resulting valuation.

■■■■ To succeed in being granted an abatement of taxes, the plaintiff has the burden of proving by a preponderance of the evidence that he is paying more than his proportional share of taxes. *Martinonis v. Town of Kingston*, 124 N.H. 304, 306, 469 A.2d 1332, 1333 (1983); *Clark v. Middleton*, 74 N.H. 188, 66 A. 115 (1907). "The statutes of the State are silent about the methods to be used in the valuation of property for taxes, and this court therefore permits considerable leeway." *Appeal of Anderson*, 120 N.H. 749, 751, 422 A.2d 1043, 1045 (1980). "In abatement petitions the trial court is empowered to make a determination of the subject property's market value . . . and all evidence before the court relating to valuation should be considered." *Brickman v. City of Manchester*, 119 N.H. 919, 920, 409 A.2d 1328, 1329–30 (1979) (citations omitted). The valuation of property is a question of fact for the trial court, and we shall not overturn its determination so long as there is sufficient credible evidence in the record to support the finding. *Town of*

*Croydon v. Current Use Advisory Bd.*, 121 N.H. 442, 446, 431 A.2d 126, 129 (1981).

The master concluded that the Water Works' property had a fair market value on April 1, 1980, of $6,170,500, the same figure at which the plaintiff's expert appraiser valued the property. Initially, after considering the topography of the property and the pertinent zoning restrictions, the master found that the "highest and best use," *590 Realty Co., Ltd. v. City of Keene*, 122 N.H. 284, 285, 444 A.2d 535, 536 (1982), of the property would be as residential property. This finding was supported by evidence produced by both parties.

The master then considered the three standard approaches to determining value and properly concluded that the cost approach and the income approach were of little help in appraising the subject property. *Cf. Steele v. Town of Allenstown*, 124 N.H. 487, 490, 471 A.2d 1179, 1181 (1984). The master then ruled that the sales comparison, or market data, approach was the most appropriate method for valuing the subject property. This method compares the subject property with similar properties which have been offered for sale or sold in recent times at known prices.

There are obvious shortcomings in this approach when used to value the Water Works' property, for, as the master observed, the "subject property is as unique a holding as one could find." Consequently, the likelihood of finding truly comparable sales is slight. Instead, sales of parcels generally similar to parts of the subject property must be used, with significant adjustments made to their prices to account for the dissimilarities between them and their counterparts within the subject property. The trial record in this case largely reflects the parties' attempts to derive, from the market data, figures that truly reflect the value of the various segments of the subject property.

The city's expert appraiser divided the property into 31 economic units and then appraised each by reference to sales of comparable property, making adjustments for time, location, size, topography, and access, as well as other distinguishing characteristics. He used price per acre as the unit of comparison. The town's expert appraised the land surrounding the lake on a shorefront-foot basis and the remaining land on an acreage basis. Also in evidence was the original appraisal made by the department, which divided the property into three areas that were analyzed separately: areas with (1) lake frontage and (2) road frontage and (3) frontage on neither the lake nor roads.

The area of greatest divergence among the three appraisals in evidence is the valuation of the land influenced by water frontage, with the dollar values placed on the so-called "back land" by the

appraisals differing only by approximately ten percent. The town's appraisal arrived at a fair market value, for that portion of the property with lake frontage, of $17,609,900, out of a total valuation of $19,475,000. The department's estimate for lake frontage property was $6,057,300, out of a total valuation of $6,636,550. The value placed on the subject property by the plaintiff's expert was $6,170,500.

In his report, the master considered the three expert appraisals, all of which relied on market data or sales comparisons to support their conclusions. In considerable detail, he analyzed and critiqued each appraisal, while recognizing the formidable task each appraiser faced in comparing property sold elsewhere to the subject property. The master then proceeded "to assess the relative merits of the appraisals" and to attempt to reconcile their valuations by reference to the "development method" of estimating fair market value.

The town's main criticism of the master's approach is directed at his use of the development method. The town argues that the master, by extending his review beyond the evidence and the three accepted approaches to valuation and by undertaking his own appraisal by use of the development method, exceeded his authority and committed reversible error. The plaintiff rebuts these contentions and defends the master's analysis by stating that the master used the development approach only as a means to "check" the relative merits of the three appraisals, and that he used the method in a way that was proper and supported by the evidence.

Reduced to its basics, the development method of approximating the fair market value of raw undeveloped land entails anticipating an ultimate developed use for the land. In terms of its methodology, value for the land once it has been improved is estimated based on a market data approach, and from this figure is subtracted the costs that are needed in order to create the improvements, including a figure for the cost of money and a figure representing a fair profit on the sale of the improved property. The resulting figure represents the value of the land, in its raw state, to the developer.

Before undertaking his analysis, the master stated: "The development method was utilized in the appraisers' review of the subject property." He concluded his analysis by stating: "The Master finds that the 'Development Method' does not support the fair market value of [the town's appraiser] and is consistent with that of [the city's appraiser]." Accordingly, he adopted the value that the plaintiff's appraiser ascribed to the subject property.

As part of his appraisal, the town's appraiser utilized a development method to test the accuracy of his market data approach. His

testimony at trial indicated that his use of the development method differed from the method outlined in the American Institute of Real Estate Appraiser's *Handbook on the Appraisal of Real Estate.* This admission opened the way for considerable criticism of the town's appraisal, most notably by the plaintiff's witness, Emil Hanslin. Hanslin, an internationally known developer, gave his opinion of the price at which a developer would consider purchasing the subject property for purposes of developing it into residential lots. That price approximated the value found by the master.

As part of his testimony leading to his opinion, Hanslin criticized the defendant's appraisal for failure to take into consideration expenditures for numerous items that would have to be procured or constructed in order to subdivide the subject property into residential lots. Hanslin also faulted the town's appraiser for not fully considering the problems associated with marketing these lots. The master's utilization of the development method differs most noticeably from the town's appraiser's use of that method in his consideration of items which Hanslin and other witnesses argued would weigh heavily in the mind of a potential buyer and thus would significantly affect the selling price of the subject property.

■ We are convinced that the master undertook his development analysis as a means of testing the accuracy of the appraisals he had before him, and only after the town's appraiser interjected its use in the proceedings. His use of this method was proper in the circumstances and was supported by the evidence.

The town's final claim of error is directed at the master's treatment of the restrictions on activities in Lake Massabesic. The master granted the following request for a finding propounded by the city: "If there were no restrictions on the use of Lake Massabesic, the value of the parcels influenced by the Lake would be approximately 25% higher than the values which [the city's appraiser] estimated for those parcels." The master further found that "[t]his restriction was imposed by the City of Manchester (Water Department) and has been in existence for many years. There is no legal impediment to the removal of said restriction."

The town maintains that because of these findings, the master erred in not increasing the value of the land affected by the lake (as estimated by the city), inasmuch as self-imposed restrictions on the use of property may not properly be taken into account in valuing that property. *See NeBoShone Assn. v. Tax Comm.,* 58 Mich. App. 324, 334, 227 N.W.2d 358, 363 (1975); *cf. Demoulas v. Town of Salem,* 116 N.H. 775, 782, 367 A.2d 588, 593 (1976) (long-term leases); *Trustees of the Phillips-Exeter Academy v. Exeter,* 92 N.H. 473, 487, 33

A.2d 665, 674 (1943) ("uses dependent upon the personal element of the user are not an element of the property in its transfer, payment for which is the keynote of value").

Our response to the defendant's argument is straightforward: The restrictions against activities on the lake, whatever be their source, are not restrictions on the subject property itself. Unquestionably, the restrictions would affect the value of the land were a sale to take place, and the master found that "[t]here was no evidence of any water supply source which once having been closed to swimming was rededicated to said use. There is little, if any, prospect of Lake Massabesic being open to swimming in the near future." On the basis of this finding, we may conclude that even if the city were to sell its property, it would not cease to use the lake as the primary source of potable water, and the would-be buyer would take subject to said restrictions.

 Accordingly, we hold that the master did not err in considering the restrictions on use of the lake in his finding of the full and true value of the property. We also hold that the master's valuation of the property was supported by the evidence.

*Affirmed.*

All concurred.