Belknap
No. 95-500

## LSP Association

v.

## Town of Gilford

November 3, 1997

*Sulloway & Hollis*, of Concord (*Margaret H. Nelson* and *Jennifer Shea Moeckel* on the briefs, and *Ms. Nelson* orally), for the plaintiffs.

*Mitchell & Bates, P.A.*, of Laconia (*Walter L. Mitchell* and *Timothy Bates* on the brief, and *Mr. Bates* orally), for the defendant.

JOHNSON, J. This is an appeal and cross-appeal from a decision of the Superior Court (*McHugh*, J.) concerning consolidated petitions for tax abatement filed under RSA 76:17 (Supp. 1994) (amended 1995) by LSP Association (association) and LSP Dwelling Unit Owners Group (unit owners) for properties located in the Town of Gilford (town) for the tax year beginning April 1, 1993. Due to the parties' resolution of two of the three questions presented on direct appeal, we will confine our review to the association's argument that the superior court erred by increasing its assessment above the amount established by the town. We will also address on cross-appeal the town's argument that the superior court erred in ruling that the site amenity charges assessed against the unit owners were improper. We reverse in part and affirm in part.

The real estate at issue, known as Lake Shore Park, consists of eighty-five acres of land with over 3,300 feet of frontage on Lake Winnipesaukee. There are 310 cottages and mobile homes in the Park. Because this use of the property predated zoning, it is permitted to continue as a preexisting use even though it violates the density requirements established by the town's current zoning ordinance. The association owns all of the land in the Park, which it operates as a "social club" for its members, the unit owners. Although the unit owners hold title to the structures, they are not given a deed to the land on which their units sit nor do they share in the ownership of any of the common amenities in the Park, such as the marina, beach, or tennis courts. If a unit is sold, all that is

transferred to the new owner is title to the structure and the unit owner's membership in the association. The parties do not dispute that the association is a recognized legal entity which has its own status as a taxpayer separate and apart from the unit owners.

In 1993, the town underwent a revaluation. The association was notified that the town proposed to assess its property in the amount of $13,900,000, which included $12,550,000 for the land and $1,350,000 for improvements. The town also proposed that each of the 310 unit owners be assessed about $20,000 on the depreciated building values of their cottages or mobile homes, for a combined assessment of $6,201,300. Together these proposed assessments totaled more than $20,100,000.

The unit owners did not dispute the assessments proposed against their structures. The association, however, objected to its proposed assessment on the grounds that (1) market conditions were distressed and (2) the 1986 assessment had been reduced from almost $6,900,000 to $5,400,000 as the result of litigation, where it had remained until the 1993 revaluation. In response to the association's objection, the town reduced the assessment to $5,598,100, which included $5,063,000 for the land and $535,100 for improvements, but then assessed a site amenity charge against each unit owner in the amount of $30,000 in addition to the $20,000 assessed for the depreciated value of each unit. The site amenity assessments totalled $9,300,000 which, when combined with the association's assessment and the depreciated building values of the cottages and mobile homes, resulted in a total assessment of over $21,000,000. The town had not assessed a site amenity charge against any other taxpayer.

Because it is not in dispute, we will assume that the plaintiffs petitioned the town for an abatement of taxes, *see* RSA 76:16 (Supp. 1994) (amended 1995), and the town denied the abatement. Appeals were then filed in the superior court, *see* RSA 76:17, and the cases were consolidated for trial. The plaintiffs' expert witness and the tax assessor for the town were the only witnesses who testified during the two-day trial. The trial court also took a view of the Park.

There were two issues before the trial court – the tax assessed against the association's land and the site amenity charges assessed against the unit owners. The trial court considered these issues to be intertwined because "the evidence is clear that the decision to reduce the land value was based solely on the decision to add a site amenity charge."

While acknowledging that some type of site amenity assessment was appropriate given the uniqueness of the Park, the trial court

concluded that the assessment of a blanket charge against the unit owners was improper for several reasons. First, the trial court found that it was patently unfair to assess the same site amenity charge against all of the units, no matter what the value of each unit or its proximity to the lake. Second, the trial court noted that because the unit owners have no legal title to the land, the imposition of a site amenity assessment against them was "potentially illegal."

After ruling that the site amenity charges were improper, the trial court chose to compensate for the lost site amenity value by including the values attributable to location and favorable density in the assessment of the association's land. It determined that the taxable value of the association's holdings was $9,299,000, not $5,600,000, an increase of almost $4,000,000. The trial court explained that its actions were justified because

> the amount contained in the Town's tax bill for land value of $5,063,000 is not a reflection of the Town's opinion of value of all of the advantages of the real estate but rather was made in an effort to respond to the objection of the Plaintiffs when it originally determined in 1993 that the land alone had a value of $12,550,000. Moreover, case law is clear that a person has the right to appeal the total tax bill only, not just a component of the tax bill. In order to prevail in a tax abatement appeal, the Plaintiff must prove the total tax assessment is improper, not that one portion of it is improper.

The trial court chose to view the actual sales prices of the units as the true measure of the Park's overall value. On average, the actual sales price of each unit was $70,000, a figure which the parties do not dispute. In determining how much of the average sales price was taxable, the court rejected the arguments of the association and the town that, respectively, sixty percent and 100 percent of the average sales price of each unit was taxable, and concluded that a value of $50,000 should be assigned to each unit. The trial court then multiplied the unit value of $50,000 by the number of units in the Park and set the Park's total assessment at $15,500,000. Of that sum, $6,201,000 was assigned as the value of the units based upon the depreciated value of the structures, leaving a balance of $9,299,000, which the trial court assigned as the value of the land.

Finally, the trial court gave little weight to the fact that prior litigation resulted in a lower assessment for the 1986 tax year for the association's property, indicating "that the major reason why

the assessment was so low was because of the poor evidence presented by the town in that case to justify a higher assessment." This appeal followed.

## I. Direct Appeal

■ We will first address the association's claim that the trial court erred by increasing its assessment for the tax year 1993 above the amount established by the town. This is a question of first impression, and the context in which it is raised is unique. We agree with the association that the trial court lacked authority to increase the association's assessment.

The right to a tax abatement and the powers of the superior court in such proceedings are dictated solely by statute. RSA 76:17; *see Appeal of Town of Sunapee*, 126 N.H. 214, 216, 489 A.2d 153, 155 (1985). The current tax abatement statutes "were based upon the Revised Statutes of 1842 and are remarkably similar to those provisions." 16 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, MUNICIPAL LAW AND TAXATION § 23.01, at 255 (1993); *see* RSA 76:16; RSA 76:16-a (1991) (amended 1995); RSA 76:17. RSA 76:16 provides, in part, that "[s]electmen or assessors, for good cause shown, may abate any tax assessed by them or their predecessors." RSA 76:16, I. If the board of selectmen or assessors neglect or refuse to abate any tax assessed by them or their predecessors, a taxpayer is authorized to seek relief from either the board of tax and land appeals, *see* RSA 76:16-a, or the superior court, *see* RSA 76:17. The taxpayer may choose which forum to use, but may not use both. *See* RSA 71-B:11 (1991).

In determining whether the trial court erred in increasing the assessment above the amount established by the town, we look first to the language of the statutes at issue. *Appeal of Town of Newmarket*, 140 N.H. 279, 282, 665 A.2d 1088, 1091 (1995). For purposes of taxation, the term "abate" means "to reduce in value." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2 (unabridged ed. 1961). Clearly, the trial court's decision to increase the assessment is contrary to the intended meaning of the term "abate" in the taxation statutes.

Next, our analysis focuses on the phrase "as justice requires." RSA 76:17 authorizes the superior court in an abatement proceeding to "make such order . . . as justice requires." This phrase has been held to confer broad discretion and equitable powers upon the superior court to abate taxes. *See Tau Chapter v. Durham*, 112 N.H. 233, 236, 293 A.2d 592, 593 (1972). The town urges us to interpret this language to allow a superior court to increase an assessment in

order to avoid an unjust and disproportionate tax burden from being placed on other taxpayers in the community. The town argues that if the legislature had intended to limit the power of the superior court in the manner suggested by the association, it could have done so through explicit statutory language. While it is true that there is no such express limitation on the powers of the superior court, an examination of the nature and purpose of the tax abatement statutes provides additional support for our holding.

■■ The New Hampshire tax abatement statutes are remedial in nature. They provide the exclusive remedy available to a taxpayer dissatisfied with an assessment made against his property. LOUGHLIN, *supra* § 23.03, at 256; *see Edes v. Boardman*, 58 N.H. 580, 594 (1879) (because the legislature provided relief by a petition for abatement, a common law action for damages would frustrate the legislative intent). The superior court's jurisdiction in an abatement proceeding is appellate, and it has the power to review the municipality's decision to determine if an abatement is warranted. The superior court may abate taxes for any cause that would justify an abatement by the selectmen. *See Appeal of Town of Sunapee*, 126 N.H. at 216, 489 A.2d at 155. In abatement proceedings, where the issue is whether the taxpayer is paying more than his share of the common tax burden, *see, e.g., Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack*, 139 N.H. 253, 254-55, 651 A.2d 928, 929 (1994), an abatement is granted on the premise that the sum assessed was disproportionately higher in relation to its true value than was the case as to other property in the town. *Id.*

Nothing in the language of the tax abatement statutes or our case law leads us to conclude that the superior court is authorized to take any action other than to decide whether a taxpayer is entitled to an abatement and, if so, in what amount. Indeed, as the association contends, any result to the contrary "is plainly not a result any taxpayer [seeking an abatement] would anticipate." The town has cited no cases or relevant legislative history contrary to the association's position, and we have found none.

■ Nonetheless, we will "examine other portions of RSA chapter 76, because all statutes upon the same subject-matter are to be considered in interpreting any one of them." *Barksdale v. Town of Epsom*, 136 N.H. 511, 515-16, 618 A.2d 814, 817 (1992) (quotation omitted). RSA 76:14 (1991) grants to a municipality the right to correct omissions or improper assessments before the expiration of the tax year for which the tax has been assessed. *See* RSA 76:14.

> The rationale for the one-year restriction on making such corrections is that the Legislature may have considered that a revision by selectmen of the doings of their predecessors would produce greater mischief than the occasional escape of taxable property from taxation. This is consistent with the provisions regarding abatement of taxes which provide that a petition for abatement must be filed with the selectmen or assessors within four months of notice of the tax. . . . Also consistent with this rationale is the fact that if a particular property is overassessed or assessed to the wrong person for a number of years and that person does not file for an abatement, the right is lost forever and the taxpayer has no remedy against the municipality other than for a year for which a petition for abatement was filed.

LOUGHLIN, *supra* § 15.06, at 204 (footnote omitted). Therefore, we conclude that if a municipality fails to correct an error of undervaluation within the established time constraints, the error is irremedial and the superior court is without power to act.

In addition, RSA 76:6 (1991) provides that in assessing taxes, the selectmen are allowed to "assess a sum not exceeding 5 percent more than [the total amount needed to cover all taxes assessed], to answer any abatements that may be made . . . ." Because this provision contemplates that tax abatement proceedings may result in decreased, but not increased, assessments, we will not interpret RSA 76:17 in a manner that would lead to inconsistent results. *See Quality Carpets v. Carter,* 133 N.H. 887, 889, 587 A.2d 254, 255 (1991) (court construes statutes so as to effectuate their evident purpose).

Our holding that the superior court erred as a matter of law by increasing the association's assessment above the amount established by the town obviates the need to decide whether the superior court's valuation of the property was supported by the record. *See City of Manchester v. Town of Auburn,* 125 N.H. 147, 154, 480 A.2d 60, 65 (1984). Although an error of undervaluation may result in as great an inequality of taxation as an error of overvaluation, our statutes provide no remedy for the town for the tax year in question. If one is to be provided, it must come from the legislature.

## II. Cross-Appeal

We now turn to the town's claim on cross-appeal that the trial court erred in ruling that the site amenity charges assessed against

the unit owners were improper. We find this claim to be without merit.

The parties do not dispute that the inclusion of the location and favorable density factors in the overall assessment of the Park is warranted. The town argues, however, that the trial court erred in assuming that because the unit owners do not hold title to the land under their units or to any of the common areas in the Park, a site amenity charge cannot legally be assessed against their units. It contends that it is permitted to tax over and above the depreciated value of the physical structure itself the value that adheres to each unit in the marketplace as a result of the site. RSA 72:6 (1991) provides that "[a]ll real estate, whether improved or unimproved, shall be taxed except as otherwise provided [by statute]."

■ Real property is generally taxed to the person claiming title to it. *See* RSA 73:10 (1991). An exception exists for a person in the possession and actual occupancy of property, if that person consents to be taxed. *Id.; see Quimby v. Quimby*, 118 N.H. 907, 910-11, 395 A.2d 1247, 1249 (1978). The trial court expressly declined to find that a unit owner's right to membership in the association is equivalent to a deed to the land upon which the owner's unit sits. Instead, the court added "the appropriate amount for the location of the property to the land value billed to the association." It justified this on two grounds: first, that the Park's proximity to Lake Winnipesaukee and its favorable density status, the two conditions that make the Park so valuable, are conditions "uniquely tied to the land"; and, second, that the association is the sole legal titleholder to the land.

The trial court found that the unit owners "have, at most, a license in [the association's] land and common facilities." Whether the unit owners are granted a license to use the association's land or, as the town contends, the equivalent of an ownership interest in land is a question of law reviewable by this court. *Quality Discount Market Corp. v. Laconia Planning Bd.*, 132 N.H. 734, 739, 571 A.2d 271, 274 (1990). A license is "a transient or impermanent interest which does not constitute an interest in land." *Id.* (quotation omitted). It "is merely a revocable personal privilege to perform an act on another individual's property." *Id.* (quotation omitted).

In determining whether a license was granted, we look to the operational instruments, in this case, the association's by-laws and the dwelling unit rights agreement, to derive the parties' intent. *Id.* at 739-40, 571 A.2d at 274. "[O]ur determination of the terms of a[n] [instrument] is based on the parties' intentions as properly found by

the trial court." *Id.* at 740, 571 A.2d at 274-75 (quotation omitted). We will uphold the ruling of the trial court unless it is not supported by the evidence or is erroneous as a matter of law. *Id.* at 740, 571 A.2d at 275.

 The fact that ownership of the land within the Park is vested solely in the association is not in question. Unlike the condominium form of ownership, the unit owners acquire title neither to the land beneath their units nor to the common areas. *See* RSA ch. 356-B (1995 & Supp. 1996) (Condominium Act). The by-laws and the dwelling unit rights agreement unambiguously grant to the unit owners, subject to certain restrictions, the right to utilize the association's land and common areas. We therefore hold that based on the parties' intentions as expressed in the documents, the trial court properly ruled that the unit owners' interest is in the nature of a license and is not a taxable interest in land.

Finally, the town argues that even if this court concludes that the site amenity charges assessed against the unit owners are improper, the superior court possesses equitable powers which permit such charges to be assessed based on the "economic reality" of the rights conferred on the unit owners. The ownership arrangement between the association and the unit owners is characterized by the town as a scheme which leads to "the mysterious disappearance of some $10,000,000 in taxable fair market value."

We rejected a similar argument in *Locke Lake Colony Assoc. v. Town of Barnstead*, 126 N.H. 136, 489 A.2d 120 (1985). There, in response to the claim that the creation of homeowners' associations as vehicles to avoid the payment of taxes on valuable property would deprive municipalities of tax revenues, we said:

> Municipalities will not lose significant tax revenues in cases such as the one before us, because, although a landowner whose property is subject to an easement is entitled to a reduced valuation, the value of the easement [is] added to the estate of the dominant owner. Presumably assessors take into account this effect of easements on value in making their appraisals.

*Id.* at 141, 489 A.2d at 123-24 (citation and quotations omitted). Similar reasoning applies in this case. That the site amenity charges cannot be assessed against the unit owners does not mean that the town is unable to account for that value in the association's assessment, at least as to tax years subsequent to 1993. Because we have already declined to address the question of the valuation of the

association's property, however, we now decline to address the related claim by the unit owners that the value that the site amenity charges purport to reflect is already encompassed within the association's assessment.

For the above reasons, the ruling of the trial court that the assessment of site amenity charges against the unit owners was erroneous as a matter of law is affirmed.

*Reversed in part; affirmed in part.*

HORTON, J., with whom BRODERICK, J., joined, dissented; the others concurred.

HORTON, J., dissenting: I agree with the majority holding reversing the trial court's ruling in regard to the abatement request of LSP Association. In abatement proceedings, the trial court may not increase the taxpayer's assessment above the amount established by the taxing authority. I respectfully disagree with the majority's mandate affirming the trial court's ruling in regard to the dwelling unit owners' assessments. Accordingly, I would reverse and remand for a determination of appropriate assessments on each dwelling unit owner's property.

The majority agrees with the trial court that the unit owners' assessments are properly limited to the cost less depreciation figure agreed to by the parties. It sees no place for intangible elements that influence most real estate values. It equates these elements with licenses and suggests that we analyze them separately from the real estate units. As a result, the majority would not tax them. To some degree, these elements are inseparable from the value of the units and are a necessary part of establishing the units' value.

RSA 72:6 (1991) provides that "[a]ll real estate, whether improved or unimproved, shall be taxed except as otherwise provided [by statute]." "Real estate" encompasses "lands, tenements, and hereditaments, and all rights thereto and interests therein." RSA 21:21, I (1988).

In order to determine the proper taxable value, real estate must be appraised at its full and true value. RSA 75:1 (1991). This is the price the property will bring in a fair market after reasonable efforts to find a purchaser who will give the highest price for it. *Public Service Co. v. New Hampton,* 101 N.H. 142, 146, 136 A.2d 591, 595 (1957).

The association and the unit owners constitute individual taxpayers. As such, their assessments must be determined separately despite the consolidation of their abatement actions. *See* RSA 73:10

(1991). Each owner is responsible for the tax assessed on his residential structure, *see* RSA 73:10, and the parties do not contest the $6,201,300 assessed for the depreciated cost of the individual units within the Park. The town argues, however, that the trial court erred in not permitting it to tax, in addition to the depreciated value of the physical structure itself, the value that inheres in each unit in the marketplace which is not reflected in the depreciated cost figure.

The trial court correctly noted that assessment of a blanket "site amenity" charge against all unit owners is not appropriate. *See Appeal of Cannata*, 129 N.H. 399, 401, 529 A.2d 896, 897 (1987) (recognizing property must be individually assessed and town cannot create broad categories of property with automatic assessments of given values). Each unit's value is not based exclusively on the depreciated cost, but also on the rights and interests that are inherent in unit ownership. *See* RSA 21:21, I. I would conclude that these rights and interests may be considered in the calculation of the units' value.

The club membership conferred with ownership of a unit and evidenced by a voting member certificate may be considered in ascertaining the unit's value for tax purposes. *See Locke Lake Colony Assoc. v. Town of Barnstead*, 126 N.H. 136, 139, 489 A.2d 120, 122 (1985). Membership in the association increases the structure's value to a prospective buyer, *see id.*, because membership will necessarily be transferred to a purchaser along with the unit, *see Public Service Co.*, 101 N.H. at 147, 136 A.2d at 596 ("transmissible value" is material for assessment purposes). A buyer can anticipate access to common areas and improvements provided to members; these privileges enhance the value of the individual lots by acting as a major attraction to purchasers. *See Locke Lake Colony Assoc.*, 126 N.H. at 139, 489 A.2d at 122. Membership is intimately intertwined with the primary use of the units. *See Appeal of Town of Plymouth*, 125 N.H. 141, 145, 479 A.2d 1388, 1390 (1984). A calculation of each unit's overall value for assessment purposes should include the value of interests that accompany unit ownership.

I also agree with the trial court that "[t]he sole reason why units at Lake Shore Park are worth as much as they are worth as supported by individual sales is the location of the structures near beautiful Lake Winnipesaukee" and that "location is an item . . . that should be part of a Town property assessment." Each unit's proximity to the lake, views, and other amenities contributes to its individual value. *See Emmons v. Company*, 83 N.H. 181, 184, 141 A. 65, 67 (1927); *Manufacturing Co. v. Gilford*, 64 N.H. 337, 348, 10 A.

849, 850 (1887). Location can be considered in computing fair market value. *See Emmons*, 83 N.H. at 184, 141 A. at 67.

The unit owners have an ownership interest in their structures. In this State, buildings are taxable as real estate. RSA 72:7 (1991). An additional interest in the land underlying the structures is not required to tax the unit owners on the fair market value of their structures. *Cf. Lin-Wood Dev. Corp. v. Town of Lincoln*, 117 N.H. 709, 711, 378 A.2d 741, 742 (1977) (rejecting argument that ski facilities located on leased portion of land could not be taxed as "real estate" because that term was limited to land owned in fee). Calculation of the fair market value of the units at Lake Shore Park should include all factors "that fairly might be brought forward and reasonably given substantial weight" in bargaining between a buyer and seller, *Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack*, 139 N.H. 253, 255, 651 A.2d 928, 930 (1994) (quotation omitted), including the value of location and the interests that accompany unit ownership. *See Gilford*, 64 N.H. at 348, 10 A. at 850 (in appraising property, "all the facts and circumstances affecting its value are competent evidence"). Property taxes should reflect the assessment value of the property as of the inventory taken in April of that tax year. *See* RSA 76:2 (1991); RSA 72:7-a (1991); *Bigwood v. Merrimack*, 113 N.H. 538, 539, 309 A.2d 895, 896 (1973).

Despite the fact that dwelling locations within the park are automatically renewed by the association each year, the association has the ability to relocate individual units within the park. This possibility will undoubtedly have some bearing on the fair market value of the structures because it affects the price a buyer would be willing to pay for the unit. *Public Service Co.*, 101 N.H. at 146, 136 A.2d at 595. Accordingly, the association's authority to change the location of the units must be considered in determining the market value of the units.

The plaintiffs argue that because the value of location and interests that accompany unit ownership have already been reflected in the association's assessment, considering these values in the unit owners' assessments constitutes impermissible double taxation. Double taxation occurs when the same property is "subject to a double tax, payable by the same party, either directly or indirectly." *Opinion of the Justices*, 77 N.H. 611, 614, 93 A. 311, 312 (1915). I would hold that considering location and interests that accompany ownership in the assessments of both the association's land and the unit owners' structures does not constitute double taxation.

The association and unit owners freely have chosen to be taxed as separate entities. *See Quimby v. Quimby*, 118 N.H. 907, 910-11, 395 A.2d 1247, 1249 (1978) (real property generally taxed to the person claiming title to it unless person in possession and actual occupancy of the property consents to be taxed). By consenting to be taxed on their individual structures, the unit owners impliedly assented to consideration of all factors that comprise the fair market value of their structures.

Furthermore, "double taxation does not exist if the property taxed in each instance is not the same." *Opinion of the Justices*, 77 N.H. at 613, 93 A. at 312. The property taxed to the association will reflect the fair market value of the land at Lake Shore Park; the property taxed to the unit owners will reflect the fair market value of the structures sited at the Park. The value of location and the interests that accompany ownership will enter into the calculation of the fair market value of both categories of real estate, *see Society Hill at Merrimack Condo. Assoc.*, 139 N.H. at 255, 651 A.2d at 930, but the "property taxed" is different in each instance. Location and interests that accompany ownership inhere in both undeveloped property as potential developable land and in developed property. Once property has been developed, these values must be allocated between the land as undeveloped and the development. In other words, to the extent that the value of location and interests that accompany ownership reflect the fully-developed value of the land and structures, this value must be allocated between the land and structures in an appropriate manner to consider the location value and interests unique to each property.

I would leave determination of the appropriate assessment amounts to the trial court. Upon examination of the individual structures and the unit owners' interests, appropriate to each unit, if the trial court finds the value of a given unit exceeds the sum originally assessed against that unit owner for the depreciated cost of the structure and the site amenity charges, then no additional amount may be added to the assessment. If the value is less than the assessed amount and if the unit owner is paying more than his proportional share of taxes, then an appropriate abatement will be required for each unit.

Once the association's amount has been assessed and each unit owner's amount is calculated, I would have the court apply an appropriate equalization value to make all assessments proportional. *Appeal of Andrews*, 136 N.H. 61, 64, 611 A.2d 632, 634 (1992) (recognizing town must apply uniform equalization ratio to ensure proportional assessments).

I respectfully dissent.

BRODERICK, J., joins in the dissent.